UNITED STATES of America,
Appellant

v.

John Peter McGOFF.

No. 87-3005.

United States Court of Appeals,
District of Columbia Circuit.

Argued May 18, 1987.

Decided Oct. 13, 1987.

Robert D. Sharp, Atty., Dept. of Justice, with whom Joseph E. diGenova, U.S. Atty. and Brian M. Murtagh, Asst. U.S. Atty.,

Washington, D.C., were on the brief for appellant. Michael W. Farrell, Asst. U.S. Atty., Washington, D.C., also entered an appearance for appellant.

Raymond G. Larroca, with whom Herbert J. Miller, Jr. and Stephen L. Braga, Washington, D.C., were on the brief for appellee.

Before BORK and STARR, Circuit Judges, and EDWARD D. RE, Chief Judge,* United States Court of International Trade.

Opinion for the Court filed by Circuit Judge STARR.

Dissenting opinion filed by Circuit Judge BORK.

STARR, Circuit Judge:

This case presents an issue of first impression. The precise question is whether the statute of limitations for the offense of failing to register as required by the Foreign Agents Registration Act of 1938 (FARA), 22 U.S.C. §§ 611-621 (1982 & Supp. III 1985), begins to run on (1) the last day that an unregistered foreign agent acts on behalf of a foreign principal, or (2) the first day that a formerly unregistered agent actually registers. Under the former approach, the Government's attempted prosecution of the defendant in this case is time-barred. Under the latter approach, the statute of limitations has not yet come into play since the defendant never registered under FARA. Presented with these competing approaches, the District Court embraced the first and accordingly dismissed the criminal information. We are now called upon to determine whether the trial court erred as a matter of law.

After careful examination of the relevant statutory provisions, as well as FARA's structure and legislative history, we find ourselves in accord with the District Court's determination. In our judgment, the trigger-point of the statute of limitations is the last day on which the foreign agent allegedly acted as such. We therefore affirm.

* Sitting by designation pursuant to 28 U.S.C. § 293(a).

## I

This case began in October 1986 when the United States Attorney filed a criminal information against John Peter McGoff.[1] The information charged that Mr. McGoff had violated sections 612 and 618 of FARA by willfully failing to register as an agent of the Republic of South Africa. *See* Information, *United States v. McGoff*, Cr. No. 86–369, at 7 (D.D.C. filed Oct. 31, 1986), *reprinted in* Joint Appendix (J.A.) at 5, 11. Mr. McGoff was then and remains a newspaper publisher and columnist,[2] who by virtue of a "deep and long-held belief," *see* Appellee's Brief at 11, has publicly advocated close ties between the United States and the Republic of South Africa. In Mr. McGoff's view, such ties are vital to the defense of the United States and the free world. *Id.*

The information alleged that in 1974 Mr. McGoff entered into a secret agreement with officials of the Republic of South Africa. *See* Information, *United States v. McGoff*, at 2, J.A. at 6. The alleged agreement had as its primary objective McGoff's purchasing *The Washington Star*, a now-defunct daily newspaper formerly published in the Nation's Capital, with funds provided *sub rosa* by South Africa. According to the information, South Africa hoped through this purchase effectively to counter the perceived anti-South Africa bias of *The Washington Post. Id.* This check and balance was to be achieved through publication of "positive material relating to the strategic and economic importance of South Africa to the United States." *Id.* The relationship between Mr. McGoff and the South African Government allegedly expanded in 1975 to include an effort to purchase an interest in UPITN Corp., an international news film distributor. *Id.* at 4, J.A. at 8. Mr. McGoff's activities on behalf of South Africa, the Government maintains, continued until June 1979, when his efforts to acquire *The Washington Star* ended in failure.[3] After this proposed acquisition fell through, the alleged agency relationship terminated. *Id.* at 5, J.A. at 9.

The information asserts that during the five-year period from 1974 to 1979, McGoff actively concealed the relationship through such clandestine devices as secret accounts, dummy corporations, and code words. *See id.* at 2–3, J.A. at 6–7. Despite these efforts, the relationship evidently came to light in late 1978 when

> a judicial commission that the government of South Africa appointed to inquire into alleged irregularities in that nation's former Department of Information ... stated that McGoff had received more than \$11.3 million from the South African government to attempt to purchase the *Washington Star* ... and a controlling interest in the United Press International and Television Network [UPITN].

*SEC v. McGoff*, 647 F.2d 185, 188 (D.C. Cir.), *cert. denied*, 452 U.S. 963, 101 S.Ct. 3114, 69 L.Ed.2d 974 (1981).[4] These disclosures prompted the Justice Department to launch an investigation into McGoff's activities in 1979 that led, years later, to the filing of the information in October 1986. *See* Joint Statement of Material Facts Not in Dispute, *United States v. McGoff*, Cr.

---

**1.** Mr. McGoff waived his right to an indictment by a grand jury. *See* Appellant's Brief at 3 n. 1.

**2.** According to McGoff's brief, in 1979, when the Government's investigation of him began, he was the president of Panax Corporation and Global Communications Corporation, entities that then published more than 65 newspapers in eight States. McGoff owned one hundred percent of Global and enjoyed an ownership interest in Panax as well. By 1986, however, McGoff's media empire had dwindled markedly to an interest in one daily newspaper and one "shopping guide" in Michigan. *See* Appellee's Brief at 11–12.

**3.** Mr. McGoff was allegedly somewhat more successful in his efforts to purchase an interest in UPITN. *See generally SEC v. McGoff*, 647 F.2d 185, 188 (D.C.Cir.), *cert. denied*, 452 U.S. 963, 101 S.Ct. 3114, 69 L.Ed.2d 974 (1981).

**4.** *SEC v. McGoff* concerned McGoff's challenge to subpoenas issued by the SEC in the course of its investigation into whether McGoff's alleged connection with South Africa violated disclosure provisions of the federal securities laws. 647 F.2d at 188–90. Aside from this factual nexus, the *SEC* litigation is unrelated to this case.

No. 86–369 (D.D.C. filed Nov. 1986), J.A. at 12.

In the proceedings below, both parties recognized that the statute-of-limitations question was one of first impression. Since the issue was potentially dispositive of the case, the parties were of the same mind that this question should be addressed first. The District Court agreed. Accordingly, the court entered an order establishing a briefing schedule and directing the parties to prepare a statement of material facts not in dispute. The parties thereafter stipulated to the following:

1. John Peter McGoff ("McGoff") last allegedly acted as an agent for the Government of the Republic of South Africa ("South Africa") on June 13, 1979. *See* Information ¶ 9.

2. McGoff never registered under the FARA as an agent of South Africa.

3. The United States of America has been investigating McGoff's relationship with South Africa since at least August of 1979.

4. McGoff has never waived his right to rely on the statute of limitations as a defense to the criminal charge in this case.

5. No factual occurrences or events have in any way tolled the running of the statute of limitations applicable to the criminal charge in this case.

*Id.* at 12–13. In light of these stipulated facts, the sole question before the District Court was one of law—when did the statute of limitations for failure to file under FARA begin to run?

In December 1986, the District Court, following oral argument, held that the period begins to run from the last day an individual allegedly acts as an agent for a foreign principal. *See* Hearing on Motion to Dismiss Information, *United States v. McGoff,* Cr. No. 86–369, at 20 (D.D.C. Dec. 19, 1986), J.A. at 86, 105. Inasmuch as the limitations period for violations of FARA is five years, *see* 18 U.S.C. § 3282 (1982) (gen-

eral statute of limitations for non-capital offenses),[5] the court concluded that the Government was required to file the information no later than June 13, 1984. *See* Stipulation 1, quoted *supra.* Since the Government had not done so, the District Court granted McGoff's motion to dismiss the information as time-barred. This appeal followed.

## II.

Before addressing the question at issue, we pause briefly to summarize the general purposes and structure of the Foreign Agents Registration Act. As the Supreme Court recently observed in a case dealing with another aspect of FARA, "[t]he statute itself explains the basic purpose of the regulatory scheme." *Meese v. Keene,* —— U.S. ——, 107 S.Ct. 1862, 1865, 95 L.Ed.2d 415 (1987). Specifically, FARA was originally enacted:

[T]o protect the national defense, internal security, and foreign relations of the United States by requiring public disclosure by persons engaging in propaganda activities for or on behalf of foreign governments, foreign political parties, and other foreign principals so that the Government and the people of the United States may be informed of the identity of such persons and may appraise their statements and actions in the light of their associations and activities.

*Id.* (quoting 56 Stat. 248–49 (1942), 22 U.S.C. § 611 Note on Policy and Purpose of Subchapter); *see also Viereck v. United States,* 318 U.S. 236, 244, 63 S.Ct. 561, 564, 87 L.Ed. 734 (1943); *Attorney General v. Irish People, Inc.,* 684 F.2d 928, 937–45 (D.C.Cir.1982), *cert. denied,* 459 U.S. 1172, 103 S.Ct. 817, 74 L.Ed.2d 1015 (1983).

Over the years, FARA's focus has gradually shifted from Congress' original concern about the political propagandist or

---

**5.** Section 3282 provides as follows:

Except as otherwise expressly provided by law, no person shall be prosecuted, tried, or punished for any offense, not capital, unless the indictment is found [sic] or the information is instituted within five years next after such offense shall have been committed. 18 U.S.C. § 3282 (1982).

subversive seeking to overthrow the Government [6] to the now familiar situation of lobbyists, lawyers, and public relations consultants pursuing the less radical goal of "influenc[ing] [Government] policies to the staisfaction [sic] of [their] particular client." S.Rep. No. 143, 89th Cong., 1st Sess. 4 (1965). But as its focus has changed, the core notion of FARA has remained the same, namely that government officials and the public generally should be able to identify those who act on behalf of a foreign principal. The idea is a frequently recurring one in modern government: public disclosure is needed in order for the public (and, at times, the Government itself) accurately to evaluate such activities.

6. The House Report accompanying the bill that became the original version of FARA echoed this legislative purpose a generation ago:
[T]he purpose ... is to require all persons who are in the United States for political propaganda purposes—propaganda aimed toward establishing in the United States a foreign system of government, or group action of a nature foreign to our institutions of government, or for any other purpose of a political propaganda nature—to register with the State Department and to supply information about their political propaganda activties [sic], their employers, and the terms of their contracts.
H.R.Rep. No. 1381, 75th Cong., 1st Sess. 2 (1937); see also S.Rep.No. 1783, 75th Cong., 3d Sess. 1–2 (1938) (incorporating House Report). Responsibility for administering the Act was later shifted from the Department of State to the Department of Justice. See Act of Apr. 29, 1942, ch. 263, § 2, 56 Stat. 248, 258 (1942); see also Inquiry Into the Matter of Billy Carter and Libya: Hearings Before the Subcomm. to Investigate the Activities of Individuals Representing the Interests of Foreign Governments of the Senate Comm. on the Judiciary, 96th Cong., 2d Sess. 117 (statement of Associate Deputy General Robert L. Keuch) [hereinafter Billy Carter Hearings].

7. The relevant provision, section 611(c), provides:
(c) Expect [sic] as provided in subsection (d) of this section, the term "agent of a foreign principal" means—
(1) any person who acts as an agent, representative, employee, or servant, or any person who acts in any other capacity at the order, request, or under the direction or control, of a foreign principal or of a person any of whose activities are directly or indirectly supervised, directed, controlled, financed, or subsidized in whole or in major part by a foreign principal, and who directly or through any other person—

The scope of persons subject to FARA is broad. Section 611 defines the critical terms "agent[s] of foreign principal[s]," to include almost anyone who undertakes any public-related or financial activity on behalf of a foreign principal. See 22 U.S.C. § 611(c).[7] Section 613, however, then exempts from FARA's sweep diplomatic agents; agents involved in commercial or non-political activities; and attorneys who represent foreign principals in legal matters before any court or government agency. See id. § 613.[8] The definition of "foreign principal" is also broad; it includes a foreign government, foreign political party, or other combinations of persons or groups organized and doing business outside the United States. See id. § 611(b).[9]

(i) engages within the United States in political activities for or in the interests of such foreign principal;
(ii) acts within the United States as a public relations counsel, publicity agent, information-service employee or political consultant for or in the interests of such foreign principal;
(iii) within the United States solicits, collects, disburses, or dispenses contributions, loans money, or other things of value for or in the interest of such foreign principal; or
(iv) within the United States represents the interests of such foreign principal before any agency or official of the Government of the United States; and
(2) any person who agrees, consents, assumes or purports to act as, or who is or holds himself out to be, whether or not pursuant to contractual relationship, an agent of a foreign principal as defined in clause (1) of this subsection.
22 U.S.C. § 611(c).
Subsection (d), in turn, shields most members of the domestic media from classification as "agent[s] of a foreign principal." Id. § 611(d).

8. Specifically, section 613 exempts seven classes of foreign agents from the requirements of 612(a): 1) diplomatic or consular officials; 2) officials of foreign governments; 3) staff members of diplomatic or consular officers; 4) persons engaged in various private, nonpolitical activities; 5) persons solely engaged in religious, scholastic, or scientific pursuits; 6) persons whose activities concern the defense of a foreign government the security of which is deemed vital to the United States; and 7) persons qualified to practice law on behalf of identified foreign principals before U.S. courts and tribunals. 22 U.S.C. § 613.

9. Section 611(b) provides:
(b) The term "foreign principal" includes—

FARA's registration requirements are set forth in section 612(a). Under the terms of that provision, an agent must, within 10 days of commencing his or her activities, file a registration statement which is to include, among other things, (1) the registrant's name and address(es); (2) the registrant's nationality; (3) a "comprehensive statement of the nature of [the] registrant's business," including a list of all employees and all foreign principals; and (4) copies of each written agreement or a description of the terms and conditions of each oral agreement. *Id.* § 612(a).[10] After initially registering, an agent is required to file supplemental statements every six months updating the information. *Id.* § 612(b).

If the agent is an association, corporation, or partnership, section 617 imposes the obligation to comply with FARA's registration requirements upon the officers of the entity. Dissolution of the organization acting as an agent "shall not relieve any officer" from fulfilling these obligations. *See id.* § 617.

A registered agent is required to "keep and preserve while he is an agent of a foreign principal such books of account and other records" as the Attorney General's regulations specify. *Id.* § 615.[11] The same section also directs the agent to "pre-serve the same for a period of three years following the termination of such status." *Id.*

Section 618 provides both criminal and civil sanctions for violations of the statute. For willful violations, subsection (a) prescribes a penalty of $10,000 or five years imprisonment, or both. *Id.* § 618(a). Subsection (f) authorizes the Attorney General to secure an injunction or restraining order whenever "any person is engaged in or about to engage in any acts which constitute or will constitute a violation of any provision [of FARA]." *Id.* § 618(f).[12]

FARA thus creates a comprehensive regulatory scheme for foreign agent registration. It delineates a certain class of individuals who must provide information to the Government. It details precisely the information required, as well as the timing of and form for that information. Finally, and more directly pertinent to the case at hand, the statute criminalizes the willful failure to comply with the information production requirements.

Notwithstanding its comprehensive scheme, FARA does not contain its own statute of limitations. Prosecutions under FARA are therefore governed by the general, five-year statute. *See supra* note 5. But there is a remaining wrinkle which has

(1) a government of a foreign country and a foreign political party;

(2) a person *outside of* the United States, unless it is established that such person is an individual and a citizen of and domiciled within the United States, or that such person is not an individual and is organized under or created by the laws of the United States or of any State or other place subject to the jurisdiction of the United States and has its principal place of business within the United States; and

(3) a partnership, association, corporation, organization, or other combination of persons organized under the laws of or having its principal place of business in a foreign country.

22 U.S.C. § 611(b).

**10.** Other items required to be included in the registration statement are: (1) a description of what compensation is involved; (2) a recitation of the precise activities undertaken pursuant to the agency; (3) if the agent is acting for a principal that is in turn controlled by a foreign principal, *see* 22 U.S.C. § 611(c)(1), a descrip-tion of the relationship; (4) any information required by the Attorney General's regulations implementing FARA; and (5) any other information necessary to keep the registration statement from being misleading. *Id.* § 612(a)(5)–(11).

**11.** *See also* 28 C.F.R. § 5.500 (1986) (specifying records to be maintained).

**12.** These civil measures were added to FARA in 1966 because the pre-existing criminal sanctions were thought too harsh for the sort of activities that were prescribed by the statute. *See* Pub. L.No. 89–486, § 7(2), 80 Stat. 244, 248 (1966); *see also Billy Carter Hearings, supra* note 6, at 181 (statement of Associate Deputy Attorney General Robert L. Keuch) (using "the criminal penalties of [FARA] [is like] going after a fly with a Howitzer"). Since these civil mechanisms have been available, it appears that the Government has never, before the present case, sought criminally to prosecute anyone solely for a violation of FARA. *See generally* Government's Reply Brief at 1–3.

given rise to the issue before us. No specific provision of FARA expressly establishes when the statute of limitations period begins to run. At the same time, two of FARA's provisions directly bear on the issue by addressing the nature and duration of the obligation to file and of the offense of failing to fulfill that obligation. It is to the interpretation of the two pertinent provisions of FARA, sections 612 and 618, that we now turn.

### III

We pause at the outset of what we acknowledge to be a difficult interpretive task to set out the principles that govern our analysis.

### A

Simply stated, the distinctive but limited role of the judiciary in cases such as this is to discern Congress' intent as embodied in the statute at hand. *See, e.g., Japan Whaling Association v. American Cetacean Society,* —— U.S. ——, 106 S.Ct. 2860, 2866–67, 92 L.Ed.2d 166 (1986); *United States v. Albertini,* 472 U.S. 675, 679–80, 105 S.Ct. 2897, 2902, 86 L.Ed.2d 536 (1985). To express our goal so succinctly has the virtue of emphasizing the cardinal (but often overlooked) principle that "legislative intention, without more, is not legislation." *Train v. City of New York,* 420 U.S. 35, 45, 95 S.Ct. 839, 845, 43 L.Ed.2d 1 (1975); *International Union, UAW v. Brock,* 746 F.2d 855, 860 (D.C.Cir.1984), *cert. denied,* 474 U.S. 825, 106 S.Ct. 81, 88 L.Ed.2d 66 (1985). We therefore cannot fulfill our duty merely by beginning with the particular statutory language in question but pausing there only briefly, as if it were a waystation en route to another destination. On the contrary, we must dwell on the language and structure of the entire statute. If our examination of the entirety of the statute evinces a clear, unequivocal answer to the interpretive question, our job is at an end. *See United States v. James,* —— U.S. ——, 106 S.Ct. 3116, 3122, 92 L.Ed.2d 483 (1986); *Garcia v. United States,* 469 U.S. 70, 75, 105 S.Ct. 479, 482–83, 83 L.Ed.2d 472 (1984); *Rubin v. United States,* 449 U.S. 424, 430, 101 S.Ct. 698, 701, 66 L.Ed.2d 633 (1981); *United States v. Oregon,* 366 U.S. 643, 648, 81 S.Ct. 1278, 6 L.Ed.2d 575 (1961); *Schwegmann Brothers v. Calvert Distillers Corp.,* 341 U.S. 384, 395–96, 71 S.Ct. 745, 751, 95 L.Ed. 1035 (1951) (Jackson, J., concurring); *United Air Lines, Inc. v. CAB,* 569 F.2d 640, 647 (D.C.Cir.1977). Since we appropriately look to sources extrinsic to the statute only for the light they may shed on the darker corridors of a statutory labyrinth, no need for resort to such sources even arises if the statute itself is clear. *Burlington Northern Railroad Co. v. Oklahoma Tax Commission,* —— U.S. ——, 107 S.Ct. 1855, 1860, 95 L.Ed.2d 404 (1987).

That being said, we hasten to acknowledge the unfortunate but inherent characteristic of both the English language and the legislative process that statutory commands are often muffled (or silent) at those points where we, as interpreters of legislative commands, would wish for greatest clarity. To be sure, the words of a statute often do (and certainly should) convey discernible meaning, and to that extent we are, obviously, bound to give them effect. *See Board of Governors v. Dimension Financial Corp.,* 474 U.S. 361, 106 S.Ct. 681, 688–89, 88 L.Ed.2d 691 (1986). But we cannot realistically expect that in every enactment Congress will speak with pristine precision so as to encompass all situations that may confront the Article III branch. Accordingly, we are not infrequently forced to venture beyond the confines of the statute in the quest for the statute's meaning. When that step is necessary, the Supreme Court has taught, it should nonetheless be taken with caution. For one thing, what on first encounter may appear to be illuminating may turn out to be a will-o'-the-wisp. *Cf. Jordan v. United States Department of Justice,* 591 F.2d 753, 767–69 (D.C.Cir.1978) (en banc); *Vaughn v. Rosen,* 523 F.2d 1136, 1142–43 (D.C.Cir.1975). For another, extrinsic sources such as committee reports and floor debates amount, at best, to precursors of legislation, to which, standing alone, courts should not give effect. *Cf.*

*INS v. Chadha,* 462 U.S. 919, 103 S.Ct. 2764, 77 L.Ed.2d 317 (1983).

To these broad principles underlying the task of judicial interpretation, two further points emerge more directly bearing on this case. First, although extrinsic sources vary widely in their reliability (and thus are not susceptible to wholesale classification as to their usefulness), when, as here, legislation arises in response to a need voiced by the Executive Branch, interpretive aid may ofttimes be found in those voices providing the impetus to legislation. *See, e.g., United States v. Rock Island Motor Transit Co.,* 340 U.S. 419 n. 9, 71 S.Ct. 382 n. 9, 95 L.Ed. 391 (1951); *see also International Brotherhood of Teamsters v. ICC,* 801 F.2d 1423, 1428 & n. 4 (D.C.Cir.1986), *reh'g granted,* 818 F.2d 87 (D.C.Cir.1987). This is especially so when, as is also true here, · the Executive takes an active role in drafting the legislation and presenting it to Congress. *See, e.g., United States v. Vogel Fertilizer Co.,* 455 U.S. 16, 31–32, 102 S.Ct. 821, 830–31, 70 L.Ed.2d 792 (1982); *Miller v. Youakim,* 440 U.S. 125, 144, 99 S.Ct. 957, 968, 59 L.Ed.2d 194 (1979). In this situation, the views and interpretations of these Executive Branch actors provide a context for what may be, in some respects, a legislative response to an executive request.

Second, while courts recognize the inevitability and, in certain contexts, the desirability of legislation that leaves some details to be resolved as the statute is applied, there are limits. Those limits are most graphic in cases involving criminal sanctions. This is elementary to our law. In the criminal context, courts have traditionally required greater clarity in draftsmanship than in civil contexts, commensurate with the bedrock principle that in a free country citizens who are potentially subject to criminal sanctions should have clear notice of the behavior that may cause sanctions to be visited upon them. *See, e.g., Dowling v. United States,* 473 U.S. 207, 218, 228–29, 105 S.Ct. 3127, 3134, 3139–40, 87 L.Ed.2d 152 (1985).

That is to say, the law of crimes must be clear. There is less room in a statute's regime for flexibility, a characteristic so familiar to us on this court in the interpretation of statutes entrusted to agencies for administration. We are, in short, far outside *Chevron* territory here. *See Chevron U.S.A. Inc. v. Natural Resources Defense Council,* 467 U.S. 837, 842–45, 104 S.Ct. 2778, 2781–83, 81 L.Ed.2d 694 (1984); *see also INS v. Cardoza-Fonseca,* — U.S. ——, 107 S.Ct. 1207, 1220–22, 94 L.Ed.2d 434 (1987). Related to that obvious point is the fact that, as a practical matter, the clarity demanded in the criminal law can prove to be more difficult to achieve in prescribing *mala prohibita* than in addressing the traditional *mala in se.* In the former, Congress is not legislating against the rich tapestry of the common law, a backdrop which may help invest enactments with meaning afforded by history. *See, e.g., Standefer v. United States,* 447 U.S. 10, 19, 100 S.Ct. 1999, 2005, 64 L.Ed.2d 689 (1980). Instead, Congress is venturing into less well-charted seas, where the frame of reference necessary to understanding may be more difficult to fix both by courts and, more fundamentally, by those who are subject to the law's strictures. *Cf. Viereck,* 318 U.S. at 241–42, 63 S.Ct. at 563–64.

With these broad principles in mind, we turn to the statutory provisions at the heart of the controversy before us.

**B**

The first (and most basic) step on any interpretive path is the language of the statute itself. *See, e.g., United States v. Hohri,* — U.S. ——, 107 S.Ct. 2246, 2250, 96 L.Ed.2d 51 (1987); *Landreth Timber Co. v. Landreth,* 471 U.S. 681, 685, 105 S.Ct. 2297, 2301–02, 85 L.Ed.2d 692 (1985); *Consumer Products Safety Comm'n v. GTE Sylvania, Inc.,* 447 U.S. 102, 108, 100 S.Ct. 2051, 2056, 64 L.Ed.2d 766 (1980); *Overseas Education Association v. FLRA,* 824 F.2d 61, 64 (D.C.Cir.1987). We therefore begin by setting out the precise terminology of one of the two relevant statutory provisions, section 618(e) of FARA:

Failure to file any such registration statement or supplements thereto as is

required by either section 612(a) or section 612(b) of this title shall be considered a continuing offense for as long as such failure exists, notwithstanding any statute of limitations or other statute to the contrary.

*Id.* § 618(e).

Section 618(e) constitutes the necessary starting point in our analysis because it creates the offense with which Mr. McGoff is charged. But the language of section 618(e), standing alone, appears not to take us very far. For the provision is essentially a cross-reference, serving to criminalize the failure to satisfy the requirements of other sections of the Act, namely sections 612(a) and 612(b). Nonetheless, examination of section 618(e) yields two important insights.

First, section 618(e) establishes that the failure to file a statement "as is required" by section 612 is a "continuing offense." Although courts are customarily to construe terms employed by Congress to have their ordinary meaning, *see, e.g., Escondido Mutual Water Co. v. La Jolla Band of Mission Indians,* 466 U.S. 765, 772, 104 S.Ct. 2105, 2110, 80 L.Ed.2d 753 (1984); *American Tobacco Co. v. Patterson,* 456 U.S. 63, 68, 102 S.Ct. 1534, 1537, 71 L.Ed.2d 748 (1982); *Overseas Education Ass'n,* 824 F.2d at 65, the term "continuing offense" is no everyday notion with an ordinary meaning. To the contrary, it is a term of art. The settled approach for interpreting such terms is therefore not one emphasizing ordinary meaning. As the Supreme Court instructed in *United States v. Freed,*

"[W]here Congress borrows terms of art in which are accumulated the legal tradition and meaning of centuries of practice, it presumably knows and adopts the cluster of ideas that were attached to each borrowed word in the body of learning from which it was taken and the meaning its use will convey to the judicial mind unless otherwise instructed."

401 U.S. 601, 607–08, 91 S.Ct. 1112, 1117–18, 28 L.Ed.2d 356 (1971) (quoting *Morissette v. United States,* 342 U.S. 246, 263, 72 S.Ct. 240, 250, 96 L.Ed. 288 (1952)); *accord NLRB v. Amax Coal Co.,* 453 U.S. 322, 329, 101 S.Ct. 2789, 2794, 69 L.Ed.2d 672 (1981). Thus, a court is to interpret such legal terms in their "familiar legal sense," *Henry v. United States,* 251 U.S. 393, 395, 40 S.Ct. 185, 186, 64 L.Ed. 322 (1920), unless Congress has provided a "contrary direction." *Morissette,* 342 U.S. at 263, 72 S.Ct. at 250. Here, we find no hint of a "contrary direction," and we thus accord the term its traditional legal meaning.

The notion of "continuing offense" has traditionally identified a type of offense fundamentally different from most known to the common law. As first-year law students (presumably) learn, a criminal offense is typically completed as soon as each element of the crime has occurred. For example, a larceny is completed as soon as there has been an actual taking of the property of another without consent, with the intent permanently to deprive the owner of its use. The offense does not "continue" over time. The crime is complete when the act is complete. A "continuing offense," in contrast, is an unlawful course of conduct that does perdure. As the Supreme Court has described the notion, "the unlawful course of conduct is 'set on foot by a single impulse and operated by an intermittent force,' until the ultimate illegal objective is finally attained." *Toussie v. United States,* 397 U.S. 112, 136, 90 S.Ct. 858, 871, 25 L.Ed.2d 156 (1970) (White, J., dissenting) (quoting *United States v. Midstate Co.,* 306 U.S. 161, 166, 59 S.Ct. 412, 414, 83 L.Ed. 563 (1939)). The classic example of a continuing offense is conspiracy.[13]

■ In borrowing the term "continuing offense" for the offense created in section 618(e), Congress imported not only the general common-law concept just described, but also a principle that bears directly on

---

13. *See generally Toussie v. United States,* 397 U.S. 112, 134–36, 90 S.Ct. 858, 870–71, 25 L.Ed.2d 156 (1970) (White, J., dissenting) (general discussion of continuing offenses, citing "embezzlement, conspiracy, bigamy, nuisance, failure to provide support, repeated failure to file reports, failure to register under the Alien Registration Act, [and] failure to notify the local board of a change in address" as examples of continuing offenses) (footnotes omitted).

the issue before us. And that is, *the statute of limitations as to prosecutions for continuing offenses runs from the last day of the continuing offense.* See *Fiswick v. United States,* 329 U.S. 211, 216, 67 S.Ct. 224, 227, 91 L.Ed. 196 (1946); *United States v. Butler,* 792 F.2d 1528, 1532–33 (11th Cir.1986) (conspiracy); *In re Corrugated Container Antitrust Litigation,* 662 F.2d 875, 886 (D.C.Cir.1981). *See generally Black's Law Dictionary* 291 (5th ed. 1979).[14] This well-settled principle suggests that to resolve the present controversy it is necessary to identify with specificity (1) what offense is created by section 618(e) and (2) when that offense is complete.

The second (and related) point to be gleaned from Congress' employment of a common-law concept is the rule that continuing offenses do not, in general, continue indefinitely. *See Toussie,* 397 U.S. at 134–36, 90 S.Ct. at 870–71 (White, J., dissenting) (discussion of what Justice White found to be the continuing offense of failing to register for the draft).[15] The express language of section 618(e) makes clear that the continuing offense created here is no exception. *See* 22 U.S.C. § 618(e); *cf.* H.R.Rep. No. 1470, 89th Cong., 2d Sess. 8 (1966), U.S.Code Cong. & Admin.News 1966, pp. 2397, 2403 (describing minor changes in the 1966 amendments to FARA as "clarifying certain ambiguities in the present act as to the time when the obligation to file registration statements commences *and terminates.*") (emphasis added).[16] According to the statutory text, the offense continues "for as long as such failure exists." The "such failure" language, in turn, refers to the "[f]ailure to file any such registration statement ... *as is required by ... section 612(a)."* 22 U.S.C. § 618(e) (emphasis added). In other words, the continuing offense proscribed by section 618(e) continues only while an individual "is required by ... section 612(a)" to file. When there is no obligation to file, there obviously can be no offense for failing to fulfill that obligation. A parsing of section 618(e) thus shows that resolution of the issue before us lies in the duration of the obligation to file imposed by section 612(a). Our focus, then, must necessarily include the proper interpretation of the latter provision.

But the Government disagrees with what would seem to be an unexceptional interpretive course. In the face of straightforward statutory language directing us to determine what "is required by ... section 612(a)," the Government argues that it is unnecessary to look beyond the text of section 618(e). Indeed, the Government's position is that section 618(e), standing alone, creates an offense that continues until actual registration regardless of the duration of the section 612(a) obligation. *See* Reply Brief for Appellant at 5–6. *See generally* Brief for Appellant at 12–14.

**14.** *Black's* defines the term "continuing offense" as follows:

> Type of crime which is committed over a span of time as, for example, a conspiracy. As to period of statute of limitations, the last act of the offense controls for commencement of the period. A "continuing offense," such that only the last act thereof within the period of the statute of limitations need be alleged in the indictment or information, is one which may consist of separate acts or a course of conduct but which arises from the singleness of thought, purpose or action which may be deemed a single impulse.

*Black's Law Dictionary* 291 (5th ed. 1979) (citations omitted).

**15.** Justice White's dissent in *Toussie* pertained to whether the offense of failing to register for the draft was a continuing offense at all. The majority did not consider the offense a continuing one and therefore had no occasion to dispute Justice White's description of continuing offenses, a discussion that we view as clear and unexceptionable. Thus, his dissenting opinion provides a useful discussion of the general principles of continuing offenses. It should therefore be clear that we have not fallen into the embarrassing, insubordinate error of ignoring the majority opinion and embracing the dissent.

**16.** Indeed, the Government acknowledges that the offense involved here does not continue indefinitely. *See* Reply Brief at 8. The dispute is over how long it continues. The Government maintains that the offense continues until actual registration occurs; on the other hand, McGoff argues that the offense continues only so long as the unregistered individual actually acts as a foreign agent.

We cannot agree.[17] The language of section 618(e) quite clearly links the trigger-point for the statute of limitations to the last day of the continuing offense described in section 612(a). The statute, as we read it, compels resort to section 612(a). Here, more fully stated, is why.

Initially, we cannot but observe that the Government's interpretation suffers from the fundamental but recurring interpretive flaw of failing to give due weight and effect to every word in the statute. *See Reiter v. Sonotone Corp.,* 442 U.S. 330, 339, 99 S.Ct. 2326, 2331, 60 L.Ed.2d 931 (1979); *In re Surface Mining Regulation Litigation,* 627 F.2d 1346, 1362 (D.C.Cir. 1980). *See generally* 2A N. Singer, *Sutherland Statutory Construction* § 46.06 (Sands 4th ed. 1984). The Government reads section 618(e) as if it created an offense continuing "as long as failure to file the statement exists," rather than as saying what it actually says. And what the provision in fact says is that the offense continues "as long as such failure exists." The term "such failure" plainly

refers to the failure to file "as is required by ... section 612(a)." [18]

The Government would have us read the word, "such," as well as the phrase, "as is required by ... section 612(a)," out of section 618(e) altogether. We are unable in conscience to accept this invitation to ignore language which Congress saw fit to enact. In the absence of a compellingly persuasive indication to the contrary,[19] we must assume that Congress intended that language which it chose to employ actually was to have meaning.

The Government's reading is also objectionable because it isolates section 618(e) from the rest of the statute, including the expressly cross-referenced section 612(a). As the Supreme Court has instructed, " 'it is well settled that, in interpreting a statute, the court will not look merely to a particular clause in which general words will be used, but will take in connection with it the whole statute ... and the objects and policy of the law.' " *Stafford v. Briggs,* 444 U.S. 527, 535, 100 S.Ct. 774,

---

**17.** Needless to say, in this criminal context, we owe no deference to the Government's interpretation of the statute. *Cf. Chevron USA v. NRDC,* 467 U.S. 837, 104 S.Ct. 2778, 81 L.Ed.2d 694 (1984); *cf. also INS v. Cardoza–Fonseca,* — U.S. ——, 107 S.Ct. 1207, 94 L.Ed.2d 434 (1987). *See supra* at 1077.

**18.** The excisions implicit in the Government's reading of section 618(e) can best be illustrated by the following language from the Government's Reply Brief:

The language [of section 618(e) ] is unambiguous and not limited in any way—"failure to file any such registration statement ... shall be a continuing offense" and that offense continues uninterrupted "for as long as such failure exists."

Reply Brief for Appellant at 9–10. This formulation, however, leaves out the cross-referencing phrase, "as is required by ... section 612(a)." It is this express reference to a coordinate provision of FARA which serves to specify what "failure" is involved. It is not a mere failure to file; it is a failure to file as required by section 612(a). If section 612(a) either (1) does not require filing in the first instance or (2) no longer requires filing, then there is either (1) no failure or (2) "such failure" no longer exists.

**19.** Courts have generally been willing to see if such indications can be found in the legislative history. *See, e.g., Burlington N. R.R. v. Okla-*

*homa Tax Comm'n,* — U.S. ——, 107 S.Ct. 1855, 1860, 95 L.Ed.2d 404 (1987); *United States v. Albertini,* 472 U.S. 675, 680, 105 S.Ct. 2897, 2902, 86 L.Ed.2d 536 (1985); *Consumer Products Safety Comm'n v. GTE Sylvania, Inc.,* 447 U.S. 102, 108, 100 S.Ct. 2051, 2056, 64 L.Ed.2d 766 (1980). This is, we respectfully suggest, an odd notion in democratic and constitutional theory. Society must, after all, be governed by law, not by non-binding, historical materials that were not passed by both Houses of Congress and presented to the President. *See INS v. Chadha,* 462 U.S. 919, 103 S.Ct. 2764, 77 L.Ed.2d 317 (1983). But, in any event, the Supreme Court has repeatedly instructed that " '[O]nly the most extraordinary showing of contrary intentions' in the legislative history will justify a departure from [the "plain and unambiguous"] language [of the statute]." *United States v. Albertini,* 472 U.S. at 680, 105 S.Ct. at 2902 (quoting *Garcia v. United States,* 469 U.S. 70, 75, 105 S.Ct. 479, 482–83, 83 L.Ed.2d 472 (1984)); *see also United States v. Turkette,* 452 U.S. 576, 580, 101 S.Ct. 2524, 2527, 69 L.Ed.2d 246 (1981); *Burlington N. R.R.,* 107 S.Ct. at 1860. Because we find the language of section 618(e) clear and unambiguous (establishing termination of the section 612(a) registration obligation as the event terminating the continuing offense), we would accordingly require a persuasive showing to the contrary in section 618(e)'s legislative history. As will be seen when we reach that phase of our analysis, the record here falls far short of this standard.

780, 63 L.Ed.2d 1 (1980) (quoting *Brown v. Duchesne*, 60 U.S. (19 How.) 183, 194, 15 L.Ed. 595 (1857)); *accord Offshore Logistics, Inc. v. Tallentire*, 477 U.S. 207, 106 S.Ct. 2485, 2494, 91 L.Ed.2d 174 (1986). This, we believe, is also one of the messages dispatched by the Supreme Court in its recent explanation of *Chevron's* meaning. *Cardoza-Fonseca*, —— U.S. ——, 107 S.Ct. 1207, 94 L.Ed.2d 434.

Thus, even in the absence of the express cross-reference to section 612(a) contained in section 618(e), we would be inclined to look to the former provision in interpreting the latter, inasmuch as section 618(e) criminalizes a failure to comply with section 612(a). But we need not deal in the dream world of hypotheticals. Section 618(e) specifically incorporates the duration of the section 612(a) obligation to file as the factor governing the duration of the continuing offense. As we have seen, the continuing offense condemned by section 618(e) exists only while there is a "failure to file ... as is required either by section 612(a) or section 612(b)." When "such failure" no longer exists, as is obviously the case when the requirement no longer exists, then the continuing offense is ended. In short, to ignore section 612(a) in the face of this express reference is not only contrary to judicially articulated principles of construction but also fundamentally at odds with the explicit statutory directive of FARA itself.

Notwithstanding what we perceive as the oddity of its general interpretive approach, the Government argues more specifically that the last phrase of section 618(e), "notwithstanding any statute of limitations or other statute to the contrary," compels us to limit our consideration to the four corners of section 618(e). We readily concede that this argument is not without force. But, upon reflection, we are persuaded that (1) this concluding phrase of section 618(e) and (2) the earlier phrase of the same sentence that directs us to section 612(a) can

and should be read in harmony, so as to drain neither of meaning. We briefly explain our reasoning in this respect.

The "notwithstanding" phrase, we note, is appended to the same clause which incorporates section 612. The former thus should not, in reason, be construed as a free-floating provision; it is part of an integrated whole. The phrase is, in our view, a statutory articulation of the common-law principle that the statute of limitations is not triggered until the conclusion of the continuing offense. That is to say, the offense continues over time despite any statute of limitations which might otherwise be thought to be triggered when the offense first began and which might thus bar prosecution before the offense had ended.

In the absence of this "notwithstanding" phrase, some doubt might well arise as to whether in employing the term "continuing offense" Congress intended to incorporate this particular common-law principle. In other words, it could be thought (as indeed was the case under FARA before the 1950 amendments) that the statute of limitations for a failure-to-register offense would begin to run from the first day the obligation existed. Under that view, the offense would terminate when the statute-of-limitations period expired, even if the underlying conduct continued. By including this phrase, then, section 618(e) ensures that termination of the section 612(a) obligation period, calculated from the day on which the conduct began, will terminate the continuing offense. This concluding phrase of section 618(e), unfortunately, offers little insight into precisely when the continuing offense ends.[20]

### C

Our rather extended treatment of section 618(e) was designed to demonstrate that the decisive question in resolving the statute-of-limitations issue is when the continu-

---

**20.** The Government appears to read this phrase as "clearly mean[ing] that nothing but actual registration by the agent will interrupt the continuing nature of the omission." Reply Brief at 10. But as we have sought to demonstrate in

the text, the phrase simply will not reasonably bear this meaning. *It is the termination of the obligation to file that terminates the continuing offense.*

ing offense terminates. This question, we are satisfied, turns on the duration of the registration obligation of section 612(a). Thus, we move at long last in our analysis from section 618(e) to the provision, namely section 612(a), referred to in the former section. Because of its obvious importance, we set forth the operative language of section 612(a) in the text which follows:

> The obligation of an agent of a foreign principal to file a registration statement shall, after the tenth day of his becoming such agent, continue from day to day, and *termination of such status shall not relieve such agent from his obligation to file a registration statement for the period during which he was an agent of a foreign principal.*

22 U.S.C. § 612(a) (emphasis added). This provision has two components. The first (non-italicized) portion complements section 618(e) by making the obligation to file a registration statement "continue from day to day"—a continuing offense. As such, this language does not hold any promise for assistance in determining when the continuing offense terminates.

It is the second, italicized portion that, we believe, provides the key to the dispute before us. As we saw above, the continuing offense terminates when the section 612(a) obligation to file expires. It is the italicized language that directly addresses the question of expiration. Before passing to consideration of this language, however, it will aid our analysis to describe briefly one aspect of the previously adumbrated filing obligation imposed by FARA. See *supra* text at 1073-81.

From the manner in which FARA defines the status of an agency relationship and mandates the content of statements (and supplements) which foreign agents must file, it appears that the statutory obligation to file expires when the agent ceases activities on behalf of the foreign principal. After all, once an individual has ceased his activities, he is no longer an "agent of a foreign principal" within the meaning of FARA. The reason is that the section defining "agent of a foreign principal" focuses solely on the agent who is acting, rather than the agent who has previously acted. Nothing in the definition indicates that it operates counterintuitively to label forever someone as an "agent of a foreign principal" because that individual once acted in such a capacity. *See* 22 U.S.C. § 611(c), quoted *supra* note 7. So too, the statute's prescriptions of the content of registration statements focus on *ongoing* relationships between agents and principals. *See id.* § 612(a)(1)–(11), (b). Inasmuch as the statute contemplates (1) an agent's filing the statement almost immediately upon becoming an agent and (2) thereafter updating that filing continually to reflect changes in the agent's activities, it also appears (although, admittedly, not expressly) to contemplate termination of the filing requirement at the time the agency relationship ends.

Further statutory evidence that Congress contemplated some definite termination of the obligations created by FARA appears in section 615. That provision requires agents who have registered to preserve records of their activities "for a period of three years following the *termination of such status.*" 22 U.S.C. § 615 (emphasis added). This understanding accords, moreover, with the stated purpose of FARA, which is to permit, promptly, evaluation of these activities as they are undertaken. *See supra* at 1073 (quoting 56 Stat. 248–49). FARA does not evince an antiquarian interest on Congress' part; FARA's focus is on the here and now.

That being said, we recognize that the italicized portion of section 612(a) could be read as extending the obligation to file beyond the life of the agency relationship itself. This is what the language appears to do by stating that "termination of such [agency] status shall not relieve such agent from his obligation to file a registration statement." 22 U.S.C. § 612(a). That language, taken alone, clearly cuts in favor of the Government's interpretation. But the provision does not stop there, however. It goes on to add a dangling phrase that muddies the interpretive waters. Specifically, the section concludes with the words, "for the period during which he was an agent of a foreign principal." Upon reflec-

tion, it appears to us that this phrase renders ambiguous the pertinent provision of section 612(a), for its meaning depends on what this prepositional phrase modifies.

Under the view advanced by the Government, the phrase modifies the word "statement," thereby serving to describe the content of the registration statement. According to this view, the statutory obligation is to file a registration statement describing "the period during which" the person acted as an agent. The second reading, championed by McGoff, is that the phrase modifies the obligation temporally, or more precisely, modifies the words "to file." That is, an agent is required "to file" only "for the period during which he was an agent of a foreign principal." Read in this fashion, the function of the italicized language, quoted *supra* at 1081–82, is to ensure that termination of the agency does not provide an affirmative defense for failure to file during the period that one is an agent.

Neither of these possible readings can confidently be embraced on the basis of grammatical structure alone. The Government's content-descriptive view might appear the more natural reading, inasmuch as the word "statement" is situated closer to the prepositional phrase than is the infinitive "to file" featured by McGoff. But the Government's reading suffers from a significant problem; it runs afoul of the well-established principle of interpretation that condemning statutory language to the rubbish heap of surplusage is much to be avoided. *See* 2A N. Singer, *Sutherland Statutory Construction* § 46.06. A FARA-required registration statement can, in logic, relate to no period other than "the period during which" the individual acted as an agent. The Government's reading, upon analysis, would thus render redundant the entire, thirteen-word phrase. It should go without saying that courts are to be reluctant to embrace such eviscerating interpretations. *See, e.g., Reiter v. Sonotone Corp.*, 442 U.S. at 339, 99 S.Ct. at 2331; *United States v. Menasche*, 348 U.S. 528, 538–39, 75 S.Ct. 513, 519–20, 99 L.Ed.

615 (1955); *National Insulation Transportation Committee v. ICC*, 683 F.2d 533, 537 (D.C.Cir.1982); *Zeigler Coal Co. v. Kleppe*, 536 F.2d 398, 406 (D.C.Cir.1976). In short, we should not cavalierly *cy pres* that which the Congress enacted and the President signed into law. *See Eagle-Picher Industries, Inc. v. EPA*, 759 F.2d 922, 930 n. 11 (D.C.Cir.1985). Accordingly, adoption of the McGoff reading would strongly be preferred upon consideration of the statutory text alone. Yet, since neither can confidently be excluded, we are constrained to conclude that section 612(a) is ambiguous.

This conclusion is buttressed by a recent decision of the United States Supreme Court, albeit in a quite different setting. In *Young v. Community Nutrition Institute*, 476 U.S. 974, 106 S.Ct. 2360, 90 L.Ed.2d 959 (1986), the statutory issue before the Court provides a striking parallel to the interpretive question now before us. *Young* concerned the proper interpretation of the following language from the Food, Drug, and Cosmetic Act:

> [W]hen such [poisonous] substance ... cannot be avoided, the Secretary shall promulgate regulations limiting the quantity therein or thereon *to such extent as he finds necessary for the protection of the public health,* and any quantity exceeding the limits so fixed shall also be deemed unsafe for purposes of the application [of another section of the Act].

21 U.S.C. § 346 (1982) (emphasis added).

The Court began its analysis by noting that "the English language does not always force a writer to specify which of two possible objects is the one to which a modifying phrase relates." 106 S.Ct. at 2364. The Food, Drug, and Cosmetic Act provision at issue provided, in the Court's view, an illustration of this principle. The phrase italicized above, the Court found, was a "dangling" modifying phrase. It could modify "quantity," or it could modify "shall promulgate." [21] While acknowl-

---

**21.** The precise options available in *Young* are grammatically identical to the options available

with respect to section 612(a) of FARA. The modifying phrase at issue in both cases is a

edging that the reading urged by the private parties (and accepted by our court) in the case "may seem to some the more natural reading," the Supreme Court pointed out that such a reading was not the only possible one and accordingly held that the statutory language was ambiguous. *Id.* at 2364–65. Having discerned ambiguity, the Court, under *Chevron* principles, deferred to the agency's longstanding interpretation of the provision as modifying "shall promulgate" and therefore not requiring promulgation of formal regulations.

Now to return to our case. After examining the entire statutory framework as well as the directly pertinent provisions, *see supra* note 21, we likewise find ourselves confronted with grammatical uncertainty like that which faced the Supreme Court in *Young.* With this sort of closely apposite and very recent precedent before us, we are persuaded that the provision before us suffers from the same flaw of ambiguity.[22]

Our dissenting colleague outlines several arguments to support his contrary position. We acknowledge the force of several of his points. At bottom, however, all roads in the dissent lead from one central axis: the statute is unambiguous. That, we believe, is in error; indeed, it is precisely the error of rigid certainty in the construction of statutory language that the Supreme Court discerned in our decision in *Young.* Surely so recent a lesson from so high a schoolmaster should not go unheeded by pupils in the ranks of the judiciary's lower precincts.

This ambiguity in the statute alone would appear to suffice in the criminal setting to invoke the time-honored rule of lenity, *see McNally v. United States,* —— U.S. ——, 107 S.Ct. 2875, 2881, 97 L.Ed.2d 292 (1987); *Tanner v. United States,* —— U.S. ——, 107 S.Ct. 2739, 2753, 97 L.Ed.2d 90 (1987); *see also infra* section IV, and thus warrant putting down our pens at this point and affirming the District Court. We nonetheless decline, perhaps academically, to short-circuit the process of trying to discern, if at all possible, Congress' intent on this issue. We therefore turn to the legislative history, mindful as we said before that this is a step to be taken cautiously under any circumstances, *see, e.g., Garcia,* 469 U.S. at 75, 105 S.Ct. at 482–83; *Oregon,* 366 U.S. at 648, 81 S.Ct. at 1281, but especially so in attempting to interpret ambiguous *criminal* provisions. We will, in short, look to see what the historical materials suggest, but we do so without in any fashion suggesting that which would be extraordinary in a free country ruled by law—that a man or woman could be convicted of a crime by virtue of extra-statutory expressions of legislative "intent" or, more precisely, "meaning" found in the web of legislative history.

The two relevant provisions, sections 612(a) and 618(e), were added to FARA in 1950, but they were parts of different enactments. Section 612(a) was part of what appears to have been a non-controversial bill comprising minor, technical amendments to FARA. Not surprisingly, what

---

prepositional phrase—"to such extent as he finds necessary for the protection of the public health" in *Young;* "for the period during which he was an agent of a foreign principal" in the case before us. The phrase in both instances could modify either a noun and thus be an adjectival prepositional phrase—the noun being "quantity" in *Young* or "statement" in our case— or a verb and thus be an adverbial prepositional phrase—the verb being "shall promulgate" in *Young* or "to file" in our case. The two cases thus present the identical grammatical dilemma.

**22.** While this conclusion led the Court in *Young* to the next step in the *Chevron* analysis—namely, deference to the agency's interpretation, *see Young,* 106 S.Ct. at 2365–66; *see also Chevron,* 467 U.S. at 843, 104 S.Ct. at 2782—and thus the

answer, it leaves us with only ambiguity. We owe, of course, no deference to the Government's construction of a criminal statute. *See supra* note 17. Indeed, general principles of interpretation of criminal statutes, *see Toussie v. United States,* 397 U.S. at 115, 90 S.Ct. at 860 ("'[C]riminal limitations statutes are "to be liberally interpreted in favor of repose."' *United States v. Scharton,* 285 U.S. 518, 522 [52 S.Ct. 416, 417, 76 L.Ed. 917] (1932).") (quoting *United States v. Habig,* 390 U.S. 222, 227, 88 S.Ct. 926, 929, 19 L.Ed.2d 1055 (1968)), as well as the rule of lenity, *see Bifulco v. United States,* 447 U.S. 381, 387, 100 S.Ct. 2247, 2252, 65 L.Ed.2d 205 (1980); *Rewis v. United States,* 401 U.S. 808, 812, 91 S.Ct. 1056, 1059, 28 L.Ed.2d 493 (1971); *see also infra* section IV–C, suggest just the opposite.

legislative history does exist establishes that section 612(a) was designed to accomplish two purposes. *First,* by creating an obligation that "continues from day to day," the statute fixed the last day on which a foreign agent acts as an agent of a foreign principal as the date from which the statute of limitations runs. *Second,* the phrase, "for the period during which he was an agent of a foreign principal," was meant to eliminate a previously available defense, namely that termination of agency status wiped out liability for failure to comply with FARA's registration requirements.

Section 618(e), in contrast, was a small part of a controversial piece of legislation, the Internal Security Act of 1950, ch. 1024, tit. I, § 20(b), 64 Stat. 1005, *reprinted in* 1950 U.S. Code Cong. Serv. 984, 1001. That measure addressed the threat of the infiltration of Communism into the public life and institutions of the United States. By virtue of the law's controversial nature, the committee reports and floor debates accompanying this legislation are quite lengthy. However, the relatively minor amendment to FARA now codified in section 618(e) seems to have been overlooked in the shuffle. At the very least, it was not the focus of attention. The voluminous legislative history of the Internal Security Act provides little discussion of the provision and hence offers little insight into the proper interpretation of section 618(e).

We thus begin by describing the common origin of the two enactments amending, respectively, sections 612(a) and 618(e). We then discuss the specific legislative history of each of the two provisions.

### 1

It is undisputed that, prior to the two 1950 amendments, *FARA's statute of limitations (then three years) began to run on the first day that an individual acted as a foreign agent.* This regime led to unreasonable results for the obvious reason that the duration of an agency relationship could easily exceed the three-year limitations period. An agent could therefore begin his or her activities, fail to register, avoid detection for the duration of the limitations period and afterwards be free to continue those activities with impunity. It was to correct this and other flaws in FARA that the Department of Justice recommended that the two provisions at issue be added to the statute.

The first provision made its inaugural appearance on Capitol Hill on January 14, 1949, when Attorney General Clark sent Senator McCarran, Chairman of the Senate Judiciary Committee, "a draft of a proposed bill relating to the internal security of the United States." Letter from Attorney General Clark to Senator McCarran (Jan. 14, 1949), *reprinted in* 95 Cong.Rec. 441 (1949). The proposed bill contained a variety of amendments to the Nation's internal security laws. Of relevance to this case is section 4(b) of the proposed legislation, which eventually became section 618(e) of FARA. Attorney General Clark's transmittal letter explained:

> [T]he purpose of this proposed amendment [i.e., section 4(b)] is to permit the prosecution of an offender at any time during the period he continues to disregard the statute and not merely within a 3–year period from the time that he first became subject to the law and should have registered but failed to do so.

*Id., reprinted in* 95 Cong.Rec. 442 (1949). This language clearly expresses dissatisfaction with the limitations period's beginning to run on the first day of the offense. It offers little insight, however, into when the limitations period was to commence under the proposed bill. On the one hand, the letter could be read to support the Government's position that prosecution is permitted at any time until one registers, whenever that occurs, because until then the agent (or more precisely, the ex-agent) could conceivably be said to be "disregard[ing] the statute." On the other hand, "disregard[ing] the statute" more naturally refers to failing to register while required under section 612(a), which, as we have seen, is during the period of the agency itself. But, in fairness, we must conclude that this short passage in Attorney General

Clark's letter offers no particular illumination on the question.

Four days after receiving the proposed bill from the Justice Department, Senator McCarran introduced it as S.595. *See* 95 Cong.Rec. 440 (1949). Following its introduction, the bill languished until it was eventually incorporated into a larger, omnibus internal security bill. *See infra* note 29.

In the meantime, the Department of Justice once again wrote to Senator McCarran, and to the Speaker of the House, this time transmitting a proposed bill that dealt exclusively with FARA. This proposed legislation proceeded quickly through both Houses and was eventually passed some two months prior to passage of section 618(e). The Department's proposed bill contained two sections, amending sections 612(a) and 617. The transmittal letter to Capitol Hill came this time not from Attorney General Clark but from Peyton Ford, Assistant to the Attorney General. Mr. Ford described the proposed amendment to section 612(a) as follows:

> [A]s the section presently reads there is room for doubt as to whether the statute of limitations against prosecution of an agent for failure to comply with the registration provisions of the act commences to run from the date on which he was first required to register or from the last day on which such unregistered agent has acted. Doubt has also arisen as to the liability of an agent to file a registration statement for the period during which he was acting as an agent of a foreign principal if he has since ceased such activity.

Letter from Peyton Ford to The Speaker, House of Representatives (Apr. 12, 1949), *reprinted in* H.R.Rep. No. 1775, 81st Cong., 2d Sess. 3 (1950). *See also* Letter from Peyton Ford to Sen. McCarran, Chairman of the Senate Judiciary Committee (Apr. 12, 1949) (same), *reprinted in* S.Rep. No. 1900, 81st Cong., 2d Sess. 2–3 (1950), U.S.Code Cong.Serv.1950, p. 2886.[23]

We thus see in the genesis of the bills amending sections 612(a) and 618(e) respectively a common concern on the part of the Executive Branch to prevent the statute of limitations from expiring while the foreign agent continued his or her efforts on behalf of a foreign principal. We see in the proposed amendment to section 612 the concern over whether an agent's ceasing activities could be deemed to cut off liability for failing to comply with FARA's registration requirements. (We likewise see in Mr. Ford's letter an "either or" approach that excludes the Government's interpretation: the statute begins to run either "from the date on which he was first required to register or from the last day on which such unregistered agent has acted.") In tracing the separate path each bill took in Congress, we find clear indications in the history of section 612(a) that Congress enacted the amendment with the intention of addressing both concerns. The issue is a bit murkier, however, in the history of section 618(e).

**2**

The legislation proposed by the Justice Department amending section 612(a) was promptly introduced on the floor of the House, *see* 95 Cong.Rec. 5207 (1949) (recording introduction of H.R. 4386 on April 27, 1949), and referred to the Judiciary Committee. *See id.*[24] The Committee Re-

---

**23.** It is significant that the Government's current position—that the statute of limitations trigger-point commences on the first day that a formerly unregistered agent actually registers—was not even mentioned as a possible interpretation by the Justice Department in the 1950 transmittal letter authored by Peyton Ford. Since the provisions of the statute at issue originated with, and were drafted by, the 1950 Justice Department, Mr. Ford's expression of the provision's intent is entitled to weight as a probative piece of legislative history. *See International Brotherhood of Teamsters v. ICC*, 801 F.2d 1423, 1428–29 (D.C.Cir.1986) (citing *United States v. Rock Island Motor Transit Co.*, 340 U.S. 419, 431 n. 9, 71 S.Ct. 382, 389 n. 9, 95 L.Ed. 391 (1951)), *rehearing granted*, 818 F.2d 87 (D.C.Cir. 1987).

**24.** H.R. 4386 was entitled "A bill to amend section 2(a) and section 7 [22 U.S.C. §§ 612(a), 617] of the Foreign Agents Registration Act of 1938, as amended, to make failure of registration a continuing offense, and to continue the obligation of officers, directors, and persons acting as such to comply with the act despite

port set forth the following description of the amendment to section 612(a) in reporting out H.R. 4386:

> The proposed amendment to section 2 [section 612 of FARA] is intended to accomplish a dual purpose. First, it will remove any doubt which may now exist that the statute of limitations will begin to run only from the last day on which an unregistered agent has acted as such within the United States. Second, it is intended to remove any doubt as to the liability of an agent to file a registration statement for the period in which he was acting as an agent and thereafter has ceased such activity.

H.R.Rep. No. 1775, 81st Cong., 2d Sess. 1 (1950). The House Report on the amendments to section 612(a) effected by H.R. 4386 furthers our understanding of this provision in two significant respects.

First, the Report evinces an intent to address the two separate concerns, which were expressed in Mr. Ford's transmittal letter, quoted *supra* at 1086, that animated the Department of Justice in proposing amendments to section 612(a). One concern should by now be familiar to the reader—prior to the amendments, the statute of limitations was viewed as commencing on the *first* day on which an agent was required to register under FARA. The second concern was that individuals subject to FARA were attempting to evade the Act's requirements by ceasing their activities and

claiming as an affirmative defense that withdrawal from an agency relationship automatically eliminated liability for failure to file.[25] H.R.Rep. No. 1775 at 2.

Second, the Committee's delineation of a "dual purpose" accords exactly with the compound structure of section 612(a) that we discerned in our analysis of the language itself. *See supra* text at 1081–83. The Report makes clear that in providing that the "obligation ... to file a registration statement shall ... continue from day to day," 22 U.S.C. § 612(a), Congress intended to establish "that the statute of limitations will begin to run only from the last day on which an unregistered agent has acted as such." That, of course, is the day on which the agency relationship terminates. This purpose is echoed in the title of the amending bill, which describes the measure as designed to make the violation of the registration obligation a "continuing offense." *See supra* note 24. To accomplish the second purpose—"to remove any doubt as to the liability of an agent to file a registration statement for the period in which he was *acting as an agent*"—Congress provided in the latter portion of section 612(a) that "termination of [foreign agency] status shall not relieve such agent from his obligation to file a registration statement for the period during which he was an agent of a foreign principal," 22 U.S.C. § 612(a). The "for the period" language of section 612(a) thus eliminated as an affirmative defense the argument that

---

dissolution of a foreign agent." *See* 96 Cong. Rec. 3433 (1950). Because this title was included as a part of the Act and does not conflict with the text itself, it is an indication of Congress' intent that a continuing offense be created. *See Hardin v. City Title & Escrow Co.*, 797 F.2d 1037, 1039 (D.C.Cir.1986); *see also Habib v. Raytheon Co.*, 616 F.2d 1204, 1210 & n. 8 (D.C.Cir.1980).

**25.** A related concern arose over a similar tactic by organizations operating on behalf of a foreign principal. The Senate Report described this tactic as follows:

> [I]t might be noted that a rather recent tactic of subversive organizations in the country today has been to resist registration under the act by replying to the request from the Department of Justice to register in the following three veins:
> (1) It has disaffiliated from the foreign principals;

(2) It has ceased the activity which required its registration;
(3) It has dissolved itself.
> The Department of Justice is of the opinion and your committee concurs that the enactment ... of the proposed bill will provide the Department with the proper weapon to combat this novel subversive tactic.

S.Rep. No. 1900 at 2; *see also* H.R.Rep. No. 1775, 81st Congs., 2d Sess. 1–2 (1950); Sen.Rep. No. 1900, 81st Cong., 2d Sess. (1950), U.S.Code Cong.Serv.1950, p. 2887. To remedy this concern, at the same time it proposed amendments to section 612, the Justice Department suggested amending section 617 to continue the liability of officers or directors of entities acting as foreign agents after dissolution of the organization. *See* 22 U.S.C. 617.

the agency relationship had ended and so too had the reporting obligation. Section 617, introduced along with amendments to 612, was designed to accomplish the same result with respect to the argument that the organization which had carried on registrable activities had dissolved. *See supra* note 25.[26]

Approximately two weeks after the Committee reported out H.R. 4386, the measure was passed by the House with no debate, *see* 96 Cong.Rec. 4610–11 (1950) (passed House on April 3, 1950), and sent to the Senate. *Id.* at 4639. The Senate Judiciary Committee reported the bill in June 1950, recommending passage without amendment. S.Rep. No. 1900, 81st Cong., 2d Sess. (1950). The Senate Report essentially mirrors the House Report. It begins by restating the contents of the letter from Peyton Ford outlining the prevalent uncertainty over the statute of limitations. Then, the Report notes the "tactic of subversive organizations" of defending prosecutions by arguing that they were dissolved or ceased their activities. *See supra* note 25. The bill, the Report summarizes, aims to achieve "[c]larification of the intendment of the section on these questions." *Id.* at 2, U.S.Code Cong.Serv.1950, p. 2887. Thus, the Senate Report, like that of the House, demonstrates an overall intent to respond to the difficulties that had arisen in the Executive Branch's administration of FARA.

In addition to reinforcing the dual purpose evident in the language of section 612(a), the Senate Report addresses the relationship between section 612(a) and 618(e) (the latter, as we have seen, having been subsumed in a comprehensive, more slow-moving internal security bill, S.595):

Attention is directed to the fact that there is presently reposing on the Senate Calendar S.595, a bill relating to the internal security of the United States, where in section 4, subsection (b) there is contained an amendment of [FARA], the effect of which is to make failure to register a continuing offense. This duplicates in part the substantive change in section 1 of the proposed law. Notwithstanding the duplication and obsolescence patent in these bills, your committee feels constrained to recommend favorably section 1 of this proposed bill as is, for the very practical reason that S.595 is in jeopardy of passage because of the controversial nature of its other subject matter. In the belief that the instant legislation is noncontroversial and would very likely be enacted into law, your committee recommends it, knowing that S.595 can be changed on the floor.

*Id.* at 2, U.S.Code Cong.Serv.1950, p. 2887.

It is apparent from this passage that the specific way in which section 618(e) "duplicates in part" the amendments to section 612(a) is by reiterating that the failure to register in compliance with section 612 is a "continuing offense," i.e., one which in the words of section 612(a) "continues from day to day." The inference seems inescapable that the amendment to section 618(e) was intended to accomplish the same purpose as this portion of the amendments to section 612, namely to ensure that the statute of limitations commenced on the day the agency relationship terminated. What is more, this interpretation accords with our analysis of section 618(e)'s language as linking the limitations period to the duration of the obligation to file established in section 612(a). *See supra* at 1075–78. By the same token, it casts substantial doubt on the Government's view that section 618(e) alone resolves the issue of when the statute of limitations begins to run.

Correlatively, the Senate Report implies that S.595 did not affect the other portion of the amendments to section 612(a). That

---

**26.** Section 617 provides in relevant part:

Each officer ... and each director ... of an agent of a foreign principal which is not an individual shall be under obligation to cause such agent to execute and file a registration statement and supplements thereto as and when such filing is required under subsec-tions (a) and (b) of section 612 of this title. ... Dissolution of any organization acting as an agent of a foreign principal shall not relieve any officer ... or any director ... from complying with the provisions of this section. 22 U.S.C. § 617.

part of the proposal was designed to defeat the affirmative defense of termination of the agency relationship. *See supra* note 25. This aim was accomplished in the part of section 612(a) providing that "termination of [foreign agency] status shall not relieve such agent from his obligation to file a registration statement for the period during which he was an agent of a foreign principal." This corollary inference makes sense in light of the fact that section 618 as a whole concerns matters of enforcement of the Act (which would include questions such as when the limitations period commenced) and does not address substantive issues, such as the availability of affirmative defenses.

Taken together, the House and Senate Reports on the amendments to section 612 leave little doubt which of the possible readings of that provision was intended by Congress. That history establishes, *first,* that a portion of section 612 was crafted for the specific purpose of causing the statute of limitations to commence on the day the agency relationship terminated; and *second,* that section 618(e), which designated failure to comply with section 612 as a "continuing offense," was intended to have the safe effect.[27]

### 3

There is one other portion of the legislative history of section 612(a) that bears on the question before us. It is found in a statement by Senator McCarran on the floor immediately before the Senate passed H.R. 4386. In response to a request for "an explanation of this bill," Senator McCarran began by observing generally that "the purpose of this bill is to close some loopholes in [FARA]." 96 Cong.Rec. 11,025 (1950) (statement of Sen. McCarran). As to the first loophole, the Senator explained that skillful tactics of "subversive organizations," *supra* note 25, would be eliminated by specifically providing that violation of section 612 would be a continuing offense. He went on separately to address the impact of the amendments on the statute of limitations in the following passage:

> This bill ... also closes another loophole, *by making certain that a person charged with violations of the act cannot plead the statute of limitations.* At the present time, it may be contended that the statute begins to run at the time when the agent was first required to register. Under such an interpretation, if he could escape prosecution for the period of the statute, he would thereafter be exempted from registering even though he continued his subversive activities. Under the bill now before the Senate the statute would begin to run only from the last day on which the unregistered agent acted as such.

*Id.*

The Government seizes upon the breadth of the italicized portion to argue that Congress intended to go beyond addressing concerns in the administration of justice by effectively eliminating altogether the statute of limitations for failure to register under FARA. In the Government's view, this passage negates the clarity with which the passages previously discussed fixed the trigger-point for the statute of limitations on the last day the agent acted in the capacity as agent for a foreign principal.

---

**27.** The dissent, with all due respect, misses the point of the foregoing analysis in suggesting that our logic somehow "retroactively excuse[s]" an agent's duty to file a registration statement "immediately upon termination of the agency relationship." Dissenting opinion at 1101. Nothing could be farther from the truth. Our interpretation vindicates the express purpose articulated by the Department of Justice in seeking to amend sections 612 and 618, which was to fill the very gap the dissent points out. The Justice Department sought to foreclose an agent from cutting off liability for failing to comply with FARA's registration requirements by simply terminating the agency, *see supra* at 1085–86; this the statute, as we interpret it, does. That is, under our reading, *the applicable statute of limitations begins to run only at the conclusion of the agency relationship.* A prosecution can thus appropriately and lawfully be brought at any time within the five-year period following the termination of that relationship. Hence, in contrast to the dissent's groundless fears, a prosecution of Mr. McGoff could properly have been instituted at any time prior to June 1984, with the Government enjoying the full measure of running room envisioned by Congress.

We are unpersuaded. For one thing, even considering only the italicized portion, Senator McCarran's statement by no means speaks with crystalline clarity. It appears to us that he could well have been referring, albeit in an imprecise way, to the fact that under the bill the statute of limitations would no longer run as long as the agency relationship continued. This reading would, of course, be consistent with the notion articulated in the very next sentence of the Senator's remarks, namely that as matters stood the statute commenced on the day foreign agents began acting as agents. For another thing, the Government's interpretation of this isolated portion of the Senator's remarks conflicts with the final sentence of the quoted passage. As the reader will readily discern, that sentence, which after all concludes the Senator's exegesis of this feature of the amendments, states quite emphatically that under the amendment to section 612(a) the limitations period will begin to run *when the agency* relationship terminates.[28]

Finally, we cannot but observe that the Government's argument contains the seeds of its own refutation by suggesting that Congressional intent to accomplish such a bold step can be gleaned in a solitary phrase of a single legislator's comments (which, of course, the members of the other House in our bicameral system would not

have had occasion to hear). If, as the Government maintains, Congress *did* intend the draconian measure of effectively eliminating the statute of limitations, the obvious question arises why the Article I branch did not accomplish this remarkable result in a more straightforward fashion, as it did for capital offenses, *see generally infra* section IV.A, and why such an unusual (indeed drastic) step did not engender any discussion or debate. We find none, nor has the Government directed our attention to any.[29]

Under these circumstances, we are well advised to pay heed to the Supreme Court's repeated admonition, grounded both in common sense and democratic theory, that the remarks of a single legislator, even the sponsor, are not controlling in analyzing legislative history. That is all the more true when, as here, those remarks examined in context are at best ambiguous and at worst internally inconsistent. *See, e.g., Weinberger v. Rossi,* 456 U.S. 25, 35 n. 15, 102 S.Ct. 1510, 1517 n. 15, 71 L.Ed.2d 715 (1982); *Chrysler Corp. v. Brown,* 441 U.S. 281, 311, 99 S.Ct. 1705, 1722, 60 L.Ed.2d 208 (1979); *Northern Colorado Water Conservancy District v. FERC,* 730 F.2d 1509, 1518 (D.C.Cir.1984). These sorts of comments are potentially useful in providing evidence of Congress' intent when and

**28.** The Government attempts to resist the clear import of this last sentence by arguing that it is ambiguous. It suggests that the "last day on which the unregistered agent acted as such" may very well mean the last day on which the agent is unregistered. Reply Brief at 13. Considered solely as an exercise in syntax, this argument is tortuously strained. What is more, it is rendered implausible when one recognizes that it is, evidently, a paraphrasing of the Senate Report language, as to which no similar argument can be mounted. The Senate Report stated that the amendments would answer the question whether the statute of limitations commenced when the agent was first required to register or "from the last day on which such unregistered agent has acted." S.Rep. No. 1900, at 1, U.S.Code Cong.Serv. 1950, p. 2887; *see also supra* at 1086–87.

**29.** It should be noted that a further amendment to FARA occurred without any discussion of the far-reaching result that the Government attributes to it. *Compare* 22 U.S.C. § 612(a) *with* Act of Aug. 3, 1950, ch. 524, § 1, 64 Stat. 399. The apparently minor amendment occurs in the last

phrase of the section. As originally amended in 1950, section 612(a) provided in relevant part as follows:

> [D]iscontinuance of such activity shall not relieve such agent from his obligation to file a registration statement for the period during which he acted within the United States as an agent of a foreign principal.

64 Stat. 399. The current version reads as follows:

> [T]ermination of such status shall not relieve such agent from his obligation to file a registration statement for the period during which he was an agent of a foreign principal.

22 U.S.C. § 612(a). The change was made in 1966 for the avowed purpose of "clarifying certain ambiguities in the ... act as to the time when the obligation to file registration statements commences and terminates." H.R.Rep. No. 1470, 89th Cong., 2d Sess. 8 (1966); *see also* S.Rep. No. 143, 89th Cong., 1st Sess. 9 (1965) (same), U.S.Code Cong. & Admin.News 1966, p. 2403.

only when "they are consistent with the statutory language and other legislative history." *Brock v. Pierce County,* 476 U.S. 253, 106 S.Ct. 1834, 1840, 90 L.Ed.2d 248 (1986) (citing *Grove City College v. Bell,* 465 U.S. 555, 567, 104 S.Ct. 1211, 1218, 79 L.Ed.2d 516 (1984)).

As a result, the most that can reasonably be made of Senator McCarran's comments on the floor is that, taken as a whole, they are not inconsistent with the House and Senate Reports. As such, these comments provide only cumulative evidence concerning which of the two plausible readings of section 612(a) is correct. The least that can be said is that the Senator's comments are internally inconsistent, a not infrequent frailty in human communication, and that as an isolated statement by a single legislator, the sentence is entitled to little weight.

**4**

Turning to the history of section 618(e), we find little in the legislative history of the Internal Security Act that even bears on the interpretation of that provision. It should be recalled that the language of section 618(e) more naturally conveys a straightforward meaning, namely (1) that the section creates an offense that continues as long as the obligation to file under section 612(a) continues, and (2) that the statute of limitations, in accord with the traditional rule concerning continuing offenses, commences only when the section 612(a) obligation to file expires. No clearly contrary indication of Congress' intent appears in the legislative history. *Cf. Burlington N.R.R.,* 107 S.Ct. at 1860; *United States v. Albertini,* 472 U.S. 675, 680, 105 S.Ct. 2897, 2902, 86 L.Ed.2d 536 (1985); *Garcia v. United States,* 469 U.S. 70, 75,

105 S.Ct. 479, 482–83, 83 L.Ed.2d 472 (1984); *United States v. Turkette,* 452 U.S. 576, 580, 101 S.Ct. 2524, 2527, 69 L.Ed.2d 246 (1981).

As we have seen, the amendment to section 618(e) enacted in 1950 originated with the Department of Justice as a proposed revision intended to "permit the prosecution of an offender at any time during the period he continues to disregard the statute and not merely within a 3–year period from the time that he first became subject to the law and should have registered but failed to do so." Letter from Attorney General Clark to Senator McCarran (Jan. 14, 1949), *reprinted in* 95 Cong.Rec. 441–42 (1949).

Unfortunately, the ambiguity in the Attorney General's description as to whether disregard of the statute continued only during the existence of an agency relationship (or, in contrast, continued indefinitely until registration took place), is not resolved in the ensuing history of section 618(e) in the Article I branch. As is so frequently the case, most remarks in the legislative history are little more than paraphrases of other language, in this instance, the Attorney General's language just quoted. *See, e.g.,* S.Rep. No. 427, 80th Cong., 1st Sess. 9 (1949) (accompanying S.595); S.Rep. No. 2369, 81st Cong., 2d Sess. 10 (1950) (accompanying S.4037).[30] The remaining references to section 618(e) for the most part merely restate section 619(e)'s terms, *see, e.g.,* 96 Cong.Rec. 14,177 (statement of Sen. McCarran); *id.* at 14,179 (statement of Sen. McCarran); H.R. Conf.Rep. No. 3112, 81st Cong., 2d Sess. 54 (1950) (conference report accompanying H.R. 9490, *see supra* note 29), another unhelpful characteristic of much that falls under the broad rubric of "legislative history."

---

**30.** The provision that eventually became section 618(e) was originally introduced by Senator McCarran as part of S.595. *See* 95 Cong.Rec. 440 (1949); *see also supra* at 1085–86. A number of other internal security measures were being considered in Congress in 1950, and in an effort to produce an omnibus bill, Senator McCarran introduced a subsequent bill, S.4037, which incorporated S.595. *See* 96 Cong.Rec. 12,145–46 (1950) (introduction of S.4037); *id.* at 14,170, 14,177 (statement of Sen. McCarran) (describing S.4037 as incorporating S.595). While the Sen-

ate was debating S.4037, the House passed an internal security bill of its own, H.R. 9490, and sent it to the Senate. The Senate passed S.4037, and then amended H.R. 9490 by replacing its provisions with the substance of S.4037. *See id.* at 14,388, 14,390, 14,628. After some minor conference changes, this version of H.R. 9490 was enacted, over Presidential veto, as the Internal Security Act of 1950, ch. 1024, tit. I, § 20(b), 64 Stat. 1005, *reprinted in* 1950 U.S.Code Cong. Serv. 1001.

Only two items from the history of the Internal Security Act go beyond paraphrasing the bill itself or the Attorney General's brief explanation. Neither, however, turns out upon analysis to be of significant assistance in addressing the question at hand. First, soon after introducing S.595, Senator McCarran solicited comments on its provisions from a number of authorities, including one Elisha Hanson, a private attorney. Mr. Hanson voiced concern that the provision which was to become section 618(e) would "in effect abolish[ ] all statutes of limitations in respect of failure to file registration statements as required by the law." *See* Letter from Elisha Hanson to Senator McCarran (June 17, 1949), *reprinted in* 95 Cong.Rec. 9748–49 (1949). Senator McCarran responded to Mr. Hanson's concerns in a letter transmitting the latter's comments to Senator Kilgore:

> The gravamen of this offense [of failing to register] is not an overt act but a mere failure to act. The offense might under some circumstances be very difficult to discover. I do not like the idea of a legal situation in which a foreign agent, if he can successfully [flout] the law for some unnamed period of time, may thereafter be forever immune to prosecution.

Letter from Senator McCarran to Senator Kilgore (July 9, 1949), *reprinted in* 95 Cong.Rec. 9749–50 (1949). Senator McCarran placed the underlying correspondence in the record in the hope that his colleagues would consider it. *See* 95 Cong.Rec. 9747 (statement of Senator McCarran).

We concede that Senator McCarran's letter could be construed to support the Government's interpretation of section 618(e). After all, the letter suggests that Senator McCarran viewed with disfavor an inability to prosecute occasioned solely due to passage of time. But quite apart from the notion that such individual comments, even by the sponsor of the legislation, are entitled to little weight, *see, e.g., Weinberger v. Rossi,* 456 U.S. at 35 n. 15, 102 S.Ct. at 1517 n. 15; *Chrysler Corp. v. Brown,* 441 U.S. at 311, 99 S.Ct. at 1722; *see supra* at 1090–91, Senator McCarran's comment, if read in the way urged by the Government, would suggest that *no*

statute of limitations would be appropriate for a failure to register. Again, we believe that if Congress had intended this remarkable result, that intent would be more clearly manifested than in an oblique reference. This is especially true in light of the different intent expressed later, in the passage of amendments to section 612(a), to begin the limitations period once the relationship of foreign agency ended. Finally, this statement lends itself to a more natural interpretation, namely that a successful flouting of the law for a specific period should not "forever" immunize a violator from prosecution. The statement does not, fairly read, convey an assumption of the polar opposite—that a violator, once having violated the statute, may *forever* be subject to prosecution.

The second historical item is similarly unhelpful. Specifically, when offering a general description of the provisions of S.595, Senator McCarran made the following point: "Fifth. It removes the penalty on failure to register under the Foreign Agents Registration Act from the statute of limitations by providing that such failure to register shall be considered a continuing offense." 96 Cong.Rec. 12,068 (1950) (statement of Senator McCarran). This comment, like Senator McCarran's letter to Senator Kilgore, is the statement of a single legislator that in its breadth could be read to accomplish a more drastic result than is indicated by the language of the statute or the rest of the legislative history. More fundamentally, this statement is incorrect as a matter of law. As discussed above, *see supra* at 1078–79, continuing offenses are not "remove[d] ... from the statute of limitations"; the statute of limitations applies with full force to such offenses.

In sum, in contrast to the legislative history of section 612(a), the legislative history of the Internal Security Act of 1950 in general, and section 618(e) in particular, provides no particular guidance in ascertaining when the continuing offense created in sections 612(a) and 618(e) terminates (and when, accordingly, the statute of limitations begins to run). We are thus

left with section 618(e) itself which, as we previously sought to establish, looks to section 612(a) to determine the duration of the offense and the statute of limitations trigger-point. Happily, while the text of section 612(a) is ambiguous, the statute's legislative history, as we have seen, speaks more clearly.

## IV

Several additional considerations, based upon the statute and its history, buttress our ultimate conclusion in this case.

## A

First, we are reluctant to embrace the Government's interpretation because, as should by now be painfully clear to the patient reader, it would virtually eliminate the statute of limitations for failure to file under FARA.[31] To accept this interpretation, we would have to overlook statutory indications that the obligation to file was to have some definite termination, and conclude that Congress intended to modify by implication the common-law principle that continuing offenses do not continue indefinitely. *See supra* at 1078–79, 1082–83. Although Congress indisputably enjoys power to provide no statute of limitations, *see* 18 U.S.C. § 3281 (no statute of limitations for capital offenses); 1 C. Torcia, *Wharton's Criminal Law* § 90, at 415–16 (14th ed. 1978) ("The protection afforded by a statute of limitations is not a matter of right but of legislative grace."), we doubt that Congress would choose to exercise such an unusual power implicitly, in such a roundabout fashion, and for an offense which does not partake of the nature of *mala in se*. After all, on the one occasion Congress actually intended to eliminate a statute of limitations, it did so explicitly. *See* 18 U.S.C. § 3281. And that solitary

instance related to the most heinous crimes known to our law. Premeditated murder is one thing; failure to disclose, even in an open, highly regulated society, is quite another.

It should go without saying that a court should not second guess the precise means Congress has chosen to implement its legislative objectives. *Cf. TVA v. Hill*, 437 U.S. 153, 173–74, 187–88, 98 S.Ct. 2279, 2291–92, 2298, 57 L.Ed.2d 117 (1978). But the fact that the Government's construction imputes to Congress an intent to act implicitly, when in other circumstances Congress demonstrated an ability to accomplish the same result clearly and explicitly, is a factor counseling against ready acceptance of the Government's interpretation. *Cf. United States v. Maze*, 414 U.S. 395, 405, 94 S.Ct. 645, 651, 38 L.Ed.2d 603 (1974).

In addition, the Government's interpretation leads to results which if not absurd, *cf. American Tobacco Co. v. Patterson*, 456 U.S. 63, 71, 102 S.Ct. 1534, 1538–39, 71 L.Ed.2d 748 (1982); *United States v. Turkette*, 452 U.S. at 580, 101 S.Ct. at 2527; *Transbrasil S.A. Linhas Aereas v. Department of Transportation*, 791 F.2d 202, 205–06 (D.C.Cir.1986), strike us as singularly unlikely to have been intended. Under the Government's construction, an individual is forever subject to prosecution and stiff criminal penalties, *see* 18 U.S.C. § 951, for an omission in the form of a failure to provide information required by what is, at bottom, a disclosure statute. As we suggested above, although such conduct is certainly not to be blinked at, it is certainly far removed from what Congress appears, before now at least, to have considered so serious as to warrant the indefinite threat of prosecution. *See id.* § 3281. Indeed, Congress' fundamental purpose, as we have seen, was not to punish foreign agents for the activities described in the

---

**31.** McGoff points to the practical realities that make it likely the statute of limitations will never come into play. Specifically, he notes that filing a late registration statement—the only event the Government claims can start the statute of limitations period—is an admission of guilt to an offense as to which, under the Government's view, the statute of limitations has not run. Whether or not this raises concerns of due process, an issue of dispute between the parties, we can take cognizance of this practical reality and recognize that for all practical purposes, the Government's construction of the statute results in no statute of limitations. The Government itself candidly recognizes this. *See* Appellant's Brief at 14–16 (arguing that Congress has the power to eliminate the statute of limitations if it so chooses).

statute; rather, it was to compel disclosure to permit evaluation of these activities. *See supra* at 1073. The addition, as we saw, of civil enforcement mechanisms in 1966 further stressed the goal of forcing disclosure rather than punishing nondisclosures.[32] If employment of criminal sanctions in this setting was indeed to employ a Howitzer in lieu of a fly swatter, *see supra* note 12, then it would be passing strange to provide for lifetime prosecutions for what the Executive obviously deemed to be something quite less than a life-or-death offense.

What is more, the facts of this case demonstrate that the prospect of long-delayed prosecutions is hardly high fiction. The Government contends that Mr. McGoff entered into an oral agreement over twelve years ago to act as an agent for the Government of South Africa. Whatever the merits of the Government's assertions, it must be apparent that a trial focusing on events that occurred so long ago presents serious practical problems; to state the obvious, witnesses may have died, memories may have faded. This is not to say that such a trial could not legitimately go forward. To the contrary, our point is much narrower. When an alternate construction is available that will avoid such difficulties, a court should eschew the interpretation that will produce absurd or unjust results and embrace the alternative, if that interpretation is consistent with the discernible legislative purpose. *See, e.g., Griffin v. Oceanic Contractors, Inc.,* 458 U.S. 564, 575, 102 S.Ct. 3245, 3252, 73 L.Ed.2d 973 (1982); *United States v. Kirby,* 74 U.S. (7 Wall.) 482, 486, 19 L.Ed. 278 (1869); *Transbrasil S.A. Linhas,* 791 F.2d at 205–06; *Government of the Virgin Islands v. Berry,* 604 F.2d 221, 225 (3d Cir.1979).

Our reluctance to embrace the far-reaching implications of the Government's position in the absence of firmer mooring in the statutory language or legislative history is reinforced by the consideration that its interpretation cannot logically be limited to the situation in which a foreign agent fails to file any statement whatsoever. Section 618(e), after all, applies to "failure[s] to file ... as is required by either section 612(a) or section 612(b)." 22 U.S.C. § 618(e). This language appears to include not only complete failures to file but also other forms of noncompliance with section 612, such as filing statements that are late, omit material facts, or contain material misstatements. Our belief that section 618(e) covers what are arguably less serious types of violations is buttressed by section 612(d), which appears to make *any* willful failure fully to comply with FARA prosecutable as a "willful failure to file a registration statement or supplement thereto," precisely that which is covered by section 618(e). This logical extension of the Government's argument would stretch the ability indefinitely to prosecute FARA violations beyond what may be considered the gravest type of violation to relatively less serious ones. It is unlikely in the extreme that this strange result reflects Congress' intent.

In sum, the presence of the types of difficulties adumbrated above counsel against embracing the Government's interpretation. Happily, in the circumstances of this case, an alternative interpretation is, as we have seen, both available and supported in the statutory text and legislative history. Inasmuch as we have found this construction to be consistent with Congress' intent—indeed, to be precisely what Congress intended—we should not hesitate to give effect to that interpretation.

**B**

McGoff argues that difficulties of constitutional proportion arise if the Government's construction is accepted. Most significantly, McGoff suggests that permit-

---

**32.** The dissent argues that the interpretation of the statute we advance precludes the Government from using the civil injunctive remedies to compel anyone to file a registration statement once the agency relationship has ended. Assuming *arguendo* that injunctive remedies would not lie once the individual's agency status has terminated, the Department of Justice is nonetheless far from powerless. The Government, after all, has available a full half-decade from the termination of the agency relationship to secure an indictment for the agent's willful failure to register under the Act.

ting the Government indefinitely to prosecute violations of FARA could in certain circumstances transgress the requirements of the Due Process Clause.

We need not dwell on this argument. It is sufficient for purposes of our analysis that no less an authority than Justice Jackson found the prospect "of an indefinitely continuing offense [which] would result in an indeterminate extension of the statute of limitations" to be "of doubtful constitutionality even if it were created by Congress." *Krulewitch v. United States*, 336 U.S. 440, 456–57, 69 S.Ct. 716, 724–25, 93 L.Ed. 790 (1949) (Jackson, J., concurring). *Cf. United States v. Lovasco*, 431 U.S. 783, 789, 97 S.Ct. 2044, 2048, 52 L.Ed.2d 752 (1977) ("[T]he 'statute of limitations does not fully define [defendants'] rights with respect to the events occurring prior to indictment,' . . . the Due Process clause has a limited role to play in protecting against oppressive delay,") (quoting *United States v. Marion*, 404 U.S. 307, 324, 92 S.Ct. 455, 465, 30 L.Ed.2d 468 (1971)). Since it is well established that a "statute should be interpreted, if fairly possible, in such a way as to free it from not insubstantial constitutional doubts," *Lynch v. Overholser*, 369 U.S. 705, 711, 82 S.Ct. 1063, 1067, 8 L.Ed.2d 211 (1962), we observe only that an interpretation the result of which Justice Jackson considered "of doubtful constitutionality" would appear to raise "not insubstantial constitutional doubts." Accordingly, the presence of such a constitutional issue is appropriately considered as a factor counseling against the Government's interpretation. *See, e.g., United States v. Five Gambling Devices*, 346 U.S. 441, 448–49, 74 S.Ct. 190, 194–95, 98 L.Ed. 179 (1953); *Crowell v. Benson*, 285 U.S. 22, 62, 52 S.Ct. 285, 296–97, 76 L.Ed. 598 (1932) (Brandeis, J.).

### C

■ Finally, and most importantly, our holding finds solid support in the well-established principle of interpretation of criminal statutes known as the rule of lenity. *See, e.g., McNally v. United States*, —— U.S. ——, 107 S.Ct. 2875, 97 L.Ed.2d 292

(1987); *Tanner v. United States*, —— U.S. ——, 107 S.Ct. 2739, 97 L.Ed.2d 90 (1987); *Bifulco v. United States*, 447 U.S. 381, 387, 100 S.Ct. 2247, 2252, 65 L.Ed.2d 205 (1980); *Rewis v. United States*, 401 U.S. 808, 812, 91 S.Ct. 1056, 1059, 28 L.Ed.2d 493 (1971); *see also Dixson v. United States*, 465 U.S. 482, 491, 104 S.Ct. 1172, 1177, 79 L.Ed.2d 458 (1984). That rule has been only recently described by the Supreme Court as follows:

> [A]mbiguity concerning the ambit of criminal statutes should be resolved in favor of lenity.

*Tanner*, 107 S.Ct. at 2753 (quoting *Rewis*, 401 U.S. at 812, 91 S.Ct. at 1059 (*citing Bell v. United States*, 349 U.S. 81, 83, 75 S.Ct. 620, 622, 99 L.Ed. 905 (1955)); *accord Lewis v. United States*, 445 U.S. 55, 65, 100 S.Ct. 915, 920, 63 L.Ed.2d 198 (1980); *United States v. Batchelder*, 442 U.S. 114, 121–22, 99 S.Ct. 2198, 2203, 60 L.Ed.2d 755 (1979); *Ladner v. United States*, 358 U.S. 169, 178, 79 S.Ct. 209, 214, 3 L.Ed.2d 199 (1958). This principle has been applied not only to the interpretation of substantive criminal provisions, but to the construction of sentencing statutes, *Simpson v. United States*, 435 U.S. 6, 14–15, 98 S.Ct. 909, 914, 55 L.Ed.2d 70 (1978), and statutes of limitations, *Toussie*, 397 U.S. at 115, 90 S.Ct. at 860.

Even the Government acknowledges the continued vitality of the rule of lenity, which would appear not in the slightest open to question in the wake of its most recent reaffirmation by a unanimous Supreme Court. *See Tanner*, 107 S.Ct. at 2753. The Government, furthermore, implicitly concedes the rule's potential applicability to this case; the Government argues instead that we should not apply the rule because section 618(e), standing alone, supplies a clear and unambiguous answer to the question of when the statute of limitations commences. *See* Brief for Appellant at 41. If the statute were indeed clear, the Government would of course be correct; as the Supreme Court repeatedly has noted, the " 'touchstone' of the rule of lenity is statutory ambiguity." *Bifulco*, 447 U.S. at 387, 100 S.Ct. at 2252; *accord Lewis*, 445 U.S. at 65, 100 S.Ct. at 921;

*Batchelder*, 442 U.S. at 121–22, 99 S.Ct. at 2203; *Huddleston v. United States*, 415 U.S. 814, 831, 94 S.Ct. 1262, 1272, 39 L.Ed.2d 782 (1974). The Supreme Court has also admonished courts not to "manufacture ambiguity where none exists." *Batchelder*, 442 U.S. at 122, 99 S.Ct. at 2203; *accord Bifulco*, 447 U.S. at 387, 100 S.Ct. at 2252.

But we do not succumb to clever "manufacturing" temptations in concluding that the statute speaks ambiguously on the issue at hand. Indeed, the most that can reasonably be said for the Government's position on the merits is that sections 612(a) and 618(e) do not clearly rule out its position. At the same time, our review of the text of the relevant statutory provisions, the statute as a whole, and the legislative history convinces us that Mr. McGoff's reading is correct: the statute of limitations for failing to register under FARA begins to run from the last day that an individual acts as an agent of a foreign principal. Thus, even if our analysis left us without a clear indication of Congressional intent, the rule of lenity would counsel strongly against the Government's interpretation.

### V

In summary, the District Court correctly dismissed as time-barred the criminal information filed against Mr. McGoff. Its judgment is therefore

*Affirmed.*

BORK, Circuit Judge, dissenting:

In 1986, the United States filed a criminal information in district court charging appellee McGoff with having been an agent of a foreign principal, the Republic of South Africa, without filing with the Attorney General the registration statement required by the Foreign Agents Registration Act. This case proceeds on the assumptions that McGoff was last an agent for South Africa in 1979, and that he never registered as an agent under the Act. It is undisputed that the statute of limitations governing McGoff's offense is five years, 18 U.S.C. § 3282 (1982), and that, if it has

begun to run, the statute has not been tolled. Prior to trial, McGoff argued that the limitations period on his offense under the Act began to run in 1979, when he had last acted as agent, so that the 1986 information was time-barred. The United States argued that the statute of limitations would not begin to run until McGoff filed a registration statement covering his activities as agent. The district court agreed with McGoff and dismissed the information.

The plain, unambiguous language of the Act demonstrates that the district court erred: the statute of limitations for a criminal prosecution of an agent's failure to register under the Act does not begin to run until the agent registers. This unavoidable conclusion, perhaps odd at first blush, is upon reflection not only compelled by the statutory language but consistent with the declared purposes and legislative history of the Act. The majority, by misreading the clear language of the Act, significantly curtails the government's ability to enforce the fundamental obligation the Act imposes on agents of foreign principals to disclose their connections and activities as agents.

### I.

### A.

The true issue in this case does not concern the statute of limitations. Rather, this case turns on the precise definition of the offense with which McGoff was charged. The Supreme Court's decision in *Toussie v. United States*, 397 U.S. 112, 90 S.Ct. 858, 25 L.Ed.2d 156 (1970), provides the framework for analysis. Toussie, who was convicted of failing to register for the military draft, argued on appeal that since his failure to register was complete when he was first required to register and did not do so, the five-year limitations period barred his prosecution eight years after that time for non-registration. *Id.* at 114, 90 S.Ct. at 860. The government conceded that Toussie had first rendered himself liable to prosecution eight years before, but argued that his offense continued until his

registration. *Id.* The Court summarized the issue: "If the offense is a continuing one the prosecution was timely, but, if not, the District Court erred in not dismissing the indictment." *Id.*

The Court held that Toussie's offense did not continue. It began by stating that a court should find that an offense continues only if either "the explicit language of the substantive criminal statute compels such a conclusion, or the nature of the crime involved is such that Congress must assuredly have intended that it be treated as a continuing one." 397 U.S. at 115, 90 S.Ct. at 860. The Court found that the draft statute, which required registration "at such time or times and place or places" as the President may prescribe, *id.* at 113, 90 S.Ct. at 859, contained no language "that clearly contemplate[d]" a continuing offense, and that a regulation under the Act referring to a continuing duty to register was insufficient, of itself, to establish a continuing offense. *Id.* at 120–21, 90 S.Ct. at 863. With only a "highly equivocal" implication that this "somewhat ambiguous" statute established a continuing offense, the Court ordered the prosecution dismissed as time-barred. *Id.* at 122–23, 90 S.Ct. at 864.[1]

The issue in this case is analogous to that in *Toussie.* Although here both sides concede that the failure to register under the Act is a continuing offense, they disagree over how long it continues. If the offense continues only so long as the agent continues his agency, prosecution of McGoff is time-barred. If the offense continues so long as the agent fails to register, prosecution of McGoff is timely. To answer the question of how long McGoff's offense continues, I rely on *Toussie's* criteria for deciding whether an offense continues at all. In the words of *Toussie,* I believe it evident that under the "explicit

language" of the Foreign Agents Registration Act McGoff's offense continues until he registers. To demonstrate this conclusion, I turn to the provisions of the Act.[2]

**B.**

Any person who subordinates himself to a foreign principal and in its behalf engages in certain enumerated activities, or anyone who agrees, or represents himself, to be such a person, is an "agent of a foreign principal" under the Act. 22 U.S.C. § 611(c) (1982). If not exempt, *see id.* §§ 611(d), 612(f), 613, every such agent is subject to the Act's registration requirement. *Id.* § 612(a).

The terms of section 612(a) are decisive of this case. The section describes an agent's registration requirement as follows:

> No person shall act as an agent of a foreign principal unless he has filed with the Attorney General a true and complete registration statement ... as required by subsection[ ] (a) ... or unless he is exempt from registration.... Except as hereinafter provided, every person who becomes an agent of a foreign principal shall, within ten days thereafter, file with the Attorney General ... a registration statement.... The obligation of an agent of a foreign principal to file a registration statement shall, after the tenth day of his becoming such agent, continue from day to day, and termination of such status shall not relieve such agent from his obligation to file a registration statement for the period during which he was an agent of a foreign principal.

22 U.S.C. § 612(a) (1982).

I discuss the elements of the registration requirement in the order of their statutory presentation. The first sentence bars an

---

1. The Court also found that there was "nothing inherent" in the offense itself to render it continuing, because, unlike conspiracy (a concededly continuing offense), the failure to register each day did not "bring a renewed threat of the substantive evil Congress sought to prevent." 397 U.S. at 122, 90 S.Ct. at 864.

2. The language, structure, purpose and legislative history of the Act, all pointing to this conclusion, distinguish this case from *Toussie,* where those factors, at best ambiguous, prompted the Court to find that the offense of failing to register for the draft did not continue at all. Here, of course, everyone agrees that McGoff's obligation continues to some degree, but the parties disagree about when it ends.

agent from acting as such without having filed a registration statement. The second sentence requires a person who becomes an agent to file a registration statement within ten days of assuming the status of agent. These two sentences are not redundant or contradictory of one another. *See Frank v. United States*, 262 F.2d 695, 696 (D.C.Cir.1958) (reversing on procedural grounds criminal conviction for failing to register as an agent under the Act and acting as agent without registration); *United States v. Peace Information Center*, 97 F.Supp. 255, 258 (D.D.C.1951). Read together, they provide that though one has ten days to file a registration statement after entering into a covered agency arrangement with a foreign principal, the agent may not *act* on that arrangement without already having filed. This two-fold statutory scheme dovetails with the Act's purpose—the Act seeks disclosure of *both* relationships with foreign principals *and* the acts that arise from them. *See Meese v. Keene*, —— U.S. ——, 107 S.Ct. 1862, 1865, 95 L.Ed.2d 415 (1987).[3]

With these two duties laid out, we are now in a position to examine the third sentence of section 612(a). That sentence divides itself into two parts. In its first part, the statute says that the agent's obligation to file a registration statement upon becoming an agent does not cease at the end of the tenth day after he becomes an agent, but "continue[s] from day to day." The reader now knows without doubt that an agent is *not* relieved of this obligation to file as soon as the ten-day period has ended. But the reader does not yet know when the agent *is* relieved of his duty to file. The exact wording of the second half

of the third sentence, fairly read, unambiguously answers that question.

**C.**

I conclude the explication of section 612(a) by first summarizing what to this point the section has said—and not said. The first two sentences affirmatively state the agent's two duties and when they begin. The statute next extends one of the two duties, the obligation to register upon becoming an agent, beyond the initial moment when registration is required. The statute is silent on when the duty not to act as an agent without having registered ends; given that silence, one might reasonably presume that just as the obligation begins when the agent begins to act as an agent, so also the obligation ends when the agent ceases acting as an agent.

One might similarly presume that the agent's obligation to file, which begins ten days after he becomes an agent, also ends when the agent is no longer an agent. But section 612(a) is not silent on *this* point, and squarely rejects any such presumption. The second half of its third sentence says: "termination of such status [*i.e.*, one's status as agent of a foreign principal] shall not relieve such agent [*i.e.*, an agent of a foreign principal] from his obligation to file a registration statement for the period during which he was an agent of a foreign principal." 22 U.S.C. § 612(a) (1982). There can be no doubt about what this language means. The first phrase means that an agent who has relinquished his agency and who has not registered at any point before or after that time is still under an obligation to register. The next phrase describes the bounds of what the former

---

**3.** The Act in its original 1938 version (known as the McCormack Act), ch. 327, 52 Stat. 631 (1938), provided only that every person who "shall ... become an agent of a foreign principal shall forthwith file" a registration statement. *Id.* § 2, 52 Stat. at 632. The distinct prohibition of acting as an agent without filing was added in 1942. Ch. 263, § 1, 56 Stat. 248, 251 (1942). The House Report on this amendment explained that the change "eliminates any doubt that may exist as to more than one possible venue of action under the present statute. Prosecution will now be possible in any district wherein an agent of a foreign principal acts without having [registered]." H.R.Rep. No. 1547, 77th Cong., 1st Sess. 3 (1941). As the Report notes, the addition of the prohibition on acting without filing "effect[ed] only a theoretical enlargement of the existing statute," since "proof of violation" of either prohibition "is practically identical." *Id.* Indeed, the grant of ten days in which to file after becoming an agent, also added by the 1942 amendment, works a contraction of the statute, which formerly had required filing "forthwith."

agent is to register—an account of his agency relationship and the acts he performed while an agent. The two phrases read together render a former agent in continuous violation of the Act until he discloses the required information. The language is simple, and it is clear.

It is helpful, though not necessary, to see how this result is required by the Act's purpose. *See Viereck v. United States,* 139 F.2d 847, 849 (D.C.Cir.1944). The Act is not meant to penalize agents of foreign principals for being agents, or to deter persons from becoming agents, but simply to cause persons to disclose information about their agency to the public. Accordingly, there is no reason to expect the Act to hinge the disclosure obligation on the continuation of the agency. Cessation of agency does not eliminate the evil the Act seeks to remedy, which is the failure to disclose; only disclosure itself, *i.e.,* registration, puts an end to that evil. Indeed, one might argue that, regardless of the statutory language, the "substantive evil Congress sought to prevent" is "renewed" by each day's failure to register, *Toussie,* 397 U.S. at 122, 90 S.Ct. at 864, so that the nature of that failure "is such that Congress must assuredly have intended that it be treated as a continuing [offense]." *Id.* at 115, 90 S.Ct. at 860. *See United States v. Bailey,* 444 U.S. 394, 413–14, 100 S.Ct. 624, 636, 62 L.Ed.2d 575 (1980) (discussed *infra* Section I.D.).

Usually, no doubt, agents will obey the law and register when they are first required to do so. Usually, therefore, disclosure will occur while the agent is still an agent. But "usually" does not mean "always," as this case illustrates. An agent who never registers but completes his agency with impunity still has not disclosed the information that the Act says the public needs. Congress has seen fit to hold the

Act's obligation over his head until he discloses that information. McGoff, under the facts before us in this case, is consequently at this moment under an obligation to register. Therefore, even apart from the Act's express reference to the statute of limitations, which I discuss later, *see infra* Section I.D., the government's prosecution of McGoff is unquestionably timely, since the limitations period for suit on a breach of a duty necessarily only begins to run when the duty ends, and McGoff's duty to file has not ended. *See Toussie,* 397 U.S. at 114–15, 90 S.Ct. at 860; *see also In re Corrugated Container Antitrust Litig.,* 662 F.2d 875, 886 (D.C.Cir.1981) (commencement of limitations period for conspiracy coincides with conspiracy's end).

The majority of this panel, however, holds that the agent's obligation to file under section 612(a) ceases when the agent ceases activities for his foreign principal. This holding is based on a strained reading of the Act. First, the language of the statute before us is not aimed at when the agent's obligation not to act without registering ends, but rather when the agent's obligation to file ends—that is the issue of statutory construction in this case. An agent who has acted for his principal in the past but has ended his activities and yet maintains his agency relationship, for example by contract, still maintains his agency "status" and must register under any reading of the Act. Indeed, even an agent who simply "holds himself out" as acting or having acted would seem obliged to register. *See* 22 U.S.C. § 611(c)(2) (1982).[4]

Second, the majority remarkably finds the second half of section 612(a)'s third sentence ambiguous. I quote the pertinent language again, adding its immediate sequel and emphasizing the words the majority believes generate ambiguity: "termi-

---

**4.** These situations seem to represent the "certain ambiguities" regarding the ending of the obligation to file that were addressed by the 1966 amendments to the Act. H.R.Rep. No. 1470, 89th Cong., 2d Sess. 8 (1966); *see* Pub.L. No. 89–486, § 2(1), 80 Stat. 244, 245 (1966). Before that amendment, the Act had stated that the "discontinuance of [an agent's] activity" as such did not relieve him of the obligation to file "for

the period during which he acted within the United States" as an agent. Ch. 524, § 1, 64 Stat. 399, 400 (1950). By referring only to the discontinuance of "activity," the statute might have exempted those agents not currently acting who nonetheless maintain the status of agent. The 1966 amendment, by basing the end point of the obligation to file on one's *status* as agent, eliminated this possible interpretation.

nation of such status shall not relieve such agent from his obligation to file a registration statement *for the period during which he was an agent of a foreign principal.* The registration statement shall include the following.... " 22 U.S.C. § 612(a) (1982) (emphasis added). In fact, all the majority's ambiguity is generated not by the phrase but solely by its first word, "for." I think it obvious that "for" means "covering," and that the phrase modifies the term "registration statement," indicating the dates that define the statement's coverage. *See* Note, *The Foreign Agents Registration Act: When is Registration Required?*, 34 S.C.L.Rev. 687, 693–94 (1983) (summarizing section 612(a)'s obligation in this way). That is, the agent must file a registration statement providing the requested information regarding the time he was an agent, and need not provide information regarding times before or after his agency.

The majority concedes that this is the "more natural" reading of the Act's language. I would add that this reading is so "natural" as to be a straightforward application of "one of the simplest canons of statutory construction," the rule of the last antecedent, which provides that "qualifying phrases" are ordinarily "to be applied to the words or phrase immediately preceding and are not to be construed as extending to others more remote." *United States v. Pritchett*, 470 F.2d 455, 459 & n. 9 (D.C.Cir. 1972). The majority nonetheless rejects this "normal reading of the language of the statute." *Id.* It instead claims that this natural reading would render the phrase "surplusage" because a registration statement required by the Act "can, in logic, relate to no period other than 'the period during which' the individual acted as an agent." Maj. op. at 1083. Even if this court were charged simply with "logical" rather than statutory interpretation, the majority's position would be mistaken. There would be nothing illogical about requiring a person who becomes an agent of a foreign principal to disclose information about himself from either before or after the time he had become an agent. Public appraisal of the "statements and actions"

of agents "in the light of their associations and activities," which is the Act's fundamental purpose, *Keene*, 107 S.Ct. at 1865, could quite logically comprise the appraisal of agents' "statements and actions" in light of their past and present "associations and activities" both within and without the agency relationship. It might "logically" assist the public's appraisal of the activity of the chief lobbyist for a foreign government, for example, to know that he was formerly the chief lobbyist for an American corporation that dealt extensively with that nation. Indeed, it would be "logical" for McGoff's belated initial registration statement to disclose not only his activity as agent for South Africa but also his subsequent activity as, to put a hypothetical example, a member of the U.S. Civil Rights Commission. That surely might assist the public appraisal of all of McGoff's actions and statements.

As a matter of "logic," therefore, the Act's registration statement could well require disclosure of information regarding the periods before or after the agency. There are also, of course, strong "logical" reasons why Congress would reject such a requirement, which would amount to the surveillance of the perfectly legal activities of now-ordinary Americans who were formerly agents. To indicate Congress' rejection of this logical but unacceptable result, the language of section 612(a) expressly restricts the temporal reach of the registration statement to the period during which the agent was an agent. *See Viereck v. United States*, 318 U.S. 236, 243, 63 S.Ct. 561, 564, 87 L.Ed. 734 (1943) (holding, under later-amended language of 1938 version of section 612(b) of the Act, that six-month supplemental registration statement need cover only activities "as agent," and not all activities in any capacity during the six months while an agent). It was necessary for Congress to address this point specifically here, since none of the items to be included in the registration statement, which the Act lists immediately after the third sentence of section 612(a), specifies a time period that relates to the period of agency, and most of the items could easily

encompass periods outside the period of agency. *See* 22 U.S.C. § 612(a)(1)–(11) (1982). Thus, far from being mere "surplusage," the phrase "for the period during which he was an agent of a foreign principal" provides a vital fact regarding the statement's coverage to every agent who must register, and especially to the agent who registers, as the preceding clause of the same sentence expressly contemplates, *after* "termination of [his agency] status."

The majority offers an alternative reading of the statute that is, to say the least, forced. The majority believes that the phrase beginning "for the period" modifies "obligation," and would rewrite the statute as follows: termination of agency status shall not relieve the agent "from his obligation for the period during which he was an agent of a foreign principal to file a registration statement." Under this reading, agents who wish to do their duty and register have no guidance from the statute, but only from the majority's "logic," on what time period their statements should cover. Moreover, by adopting this reading, it is the majority that renders the language of the Act "surplusage," at best. According to that reading, the statute provides that termination of one's agency does not relieve the agent of his duty to register while he was an agent. This says nothing. It would be bizarre to suppose that an agent's duty to file a registration statement, which in the majority's view is owed to the government only so long as he is an agent, might be somehow retroactively excused (absent the passage in question) immediately upon termination of the agency relationship. The majority apparently believes that it would be plausible to regard an obligation arising from and existing only during a relationship, as somehow being dissolved during the relationship by the relationship's subsequent termination. I find this proposition odd, to say the least. No criminal statute works this way. Yet the only function this passage in the Act has under the majority's reading is to dispel that proposition with the truism that even if the agent later ceases to be an agent, he remains liable while an agent to perform his duty as an agent. This is surplusage of a very high order.[5]

Perhaps the simplest, but most compelling, proof that the majority reads section 612(a) erroneously is this: removal of the word "not" from the statute would give the majority exactly the sense it wants. The statute then would say, "termination of [the agent's] status shall relieve [the] agent from his obligation to file a registration statement for the period during which he was an agent of a foreign principal." I am confident that the majority and I would agree that this language would end the agent's duty with his agency. Unfortunately for the majority, this is the exact opposite of the statute Congress did write. It is obvious that the majority's reading of the real statute is completely untenable.

As I have shown, section 612(a) clearly requires the conclusion that the agent's obligation to register continues beyond the termination of his agency. The language is unambiguous, it comports with the section's structure, and promotes the Act's purpose. In contrast, the majority's reading of the section leaves a gaping hole in the statute, blunts its purpose, and is, on its own terms, incoherent. McGoff today remains obliged under section 612(a) to file a registration statement as an agent of a foreign principal, and may be prosecuted for his failure to do so.

**D.**

Section 618 of the Act grants the government the power to enforce in various ways

---

5. The majority points out that under its reading, an agent who failed to register could be prosecuted at any time up to five years after termination of the agency relationship. I do not doubt that. But this does not "vindicate[ ] the express purpose articulated by the Department of Justice," as the majority claims. Maj. op. at 1089 n. 27. The reports indicate, *see infra* pp. 1104–05, that the Justice Department had experienced instances in which an ex-agent had resisted *registration,* not prosecution, on the ground that his agency had terminated. One of the express purposes articulated by the Department of Justice was thus to insure the registrability of ex-agents. The majority's interpretation extinguishes the agent's obligation to register upon termination of agency and is thus directly contrary to an express purpose of the legislation.

all of the obligations imposed by the Act. 22 U.S.C. § 618 (1982 & Supp. III 1985). Section 618(a) imposes criminal penalties for violations of "any provision" of the Act. *Id.* § 618(a). It therefore renders liable for prosecution any person who breaches the obligations under section 612(a) discussed above by acting as an agent of a foreign principal without registering or by becoming such an agent but failing to register within ten days thereafter. As does section 612(a), however, section 618 singles out the failure to file a registration statement for additional attention. 22 U.S.C. § 618(e) (1982). Section 618(e) complements the discussion of the obligation to file in section 612(a) by establishing a correlative liability for breach of that obligation.[6] Just as the obligation to file "continues from day to day," *id.* § 612(a), so also liability for the breach of that obligation, *i.e.*, the failure to file, "shall be considered a continuing offense." *Id.* § 618(e). And just as the obligation to file does not end with the "termination of [one's agent] status" but continues until he files, *id.* § 612(a), so also liability for the failure to file continues "for as long as such failure exists, notwithstanding any statute of limitation or other statute to the contrary." *Id.* § 618(e). Since the statute of limitations limits not an obligation but the prosecution of its breach, it is unsurprising that the Act explicitly address the limitations period here rather than in section 612(a).[7]

By correlating a liability to the obligation to file, section 618(e) completes the work begun in section 612(a). But it also does more. Without section 618(e), and knowing that any violation of the Act's provisions is subject to prosecution under 618(a), a court might be reluctant to find that the section 612(a) duty to register continues until the agent registers. The court would base its reluctance on the tension between the continuation of offenses and the policy of repose expressed through statutes of limitation. *See Toussie*, 397 U.S. at 114–15, 90 S.Ct. at 860. In my view, as previously discussed, the explicit language of section 612(a) overcomes this reluctance, as *Toussie* permits. *See* 397 U.S. at 115, 90 S.Ct. at 860. But, in addition, section 618(e) completely dispels the tension discussed in *Toussie*, and hence eliminates the sole basis for any legitimate reluctance about the proper result in this case. *United States v. Bailey*, 444 U.S. 394, 100 S.Ct. 624, 62 L.Ed.2d 575 (1980), makes this plain. In *Bailey*, the Court construed a statute criminalizing escape from federal custody, 18 U.S.C. § 751(a) (1982), as establishing a continuing offense that ends only when the escapee turns himself in, so that "an escapee can be held liable for failure to return to custody as well as for his initial departure." 444 U.S. at 413, 100 S.Ct. at 636. The Court acknowledged that there should

---

**6.** The majority understands the government to argue that "section 618(e), standing alone, creates an offense that continues until actual registration regardless of the duration of the section 612(a) obligation." Maj. op. at 1079. While the structure and rhetoric of the government's briefing and argument gave less than full attention to § 612(a), I do not believe the government suggests that § 612(a) is irrelevant. Rather, the government acknowledges that one must in reading § 618(e) "refer to the obligation that is provided by" § 612, Reply Brief for Appellant at 5–6, but insufficiently explains the precise meaning of that obligation.

**7.** Nothing in the Act addresses the limitations period for prosecution of one who acts without registering in violation of § 612(a), or for prosecution of any other violation of the Act's provisions. This also is unsurprising, for the Act designates none of those violations as continuing offenses, and they presumably are uncontr-

oversially governed by the five-year catch-all statute of limitations.

I note at this point that the majority, mistakenly following McGoff's brief, Brief for Appellee at 35–36, thinks that failure to file under § 612(a) of the Act also gives rise to "prosecution and stiff criminal penalties," maj. op. at 1093, under 18 U.S.C. § 951 (Supp. III 1985). The provision at issue, stemming from 1917 and wholly independent of the Act, penalizes one who "acts in the United States as an agent of a foreign government without prior notification to the Attorney General." *Id.* Nothing in the statute suggests that its purpose is public disclosure or that the offense it creates is continuing. It seems obvious that the usual five-year limitation period would begin to run for this offense as soon as the agency ceases acting as such. But in any event, the statute is simply irrelevant to this case. *See United States v. Melekh*, 193 F.Supp. 586, 591 (N.D.Ill.1961).

be "restraint" in finding continuing offenses, due to the tension set out in *Toussie* between statutes of limitation and continuing offenses. *Id.* at 413–14, 100 S.Ct. at 636. But the Court found that tension "wholly absent" from the case before it because another federal statute, 18 U.S.C. § 3290 (1982), suspended the statute of limitations as long as the escapee remained at large. 444 U.S. at 414 & n. 10, 100 S.Ct. at 636 & n. 10.

The parallel between this case and *Bailey* dictates the result here. In each case, there is a continuing offense of omission—failure to turn oneself in, failure to register oneself—that ends only with the end of the proscribed omission. In each case, there is a separate express statutory provision that suspends the operation of the statute of limitations for that offense of omission. In *Bailey*, the statutory suspension of the limitations period enabled the Supreme Court to find without hesitation that the offense did indeed continue until the omission was remedied. In this case, the express language of section 618(e) should equally dispel any hesitation over finding liability for the failure to file under the Act to continue until one has filed.[8]

### E.

To sum up, the explicit language of sections 612(a) and 618(e) of the Act have established an obligation and a corresponding liability on every agent of a foreign principal to file a registration statement or be subject to legal liability. The duty to file, and the offense by omission of failing to file, only cease when the agent files. I

close my discussion of the statutory language and structure by noting that the issue in this case, and the majority's mistaken disposition of that issue, reach beyond the Act's provision for criminal prosecutions. Criminal prosecutions under the Act have been rare. *See Attorney General v. Irish People, Inc.*, 684 F.2d 928, 945 (D.C.Cir.1982). But the civil injunctive remedy available to the United States for "any acts ... [in] violation of[,] ... or [any failure] to comply with[,] any of the provisions of [the Act]," 22 U.S.C. § 618(f) (Supp.III 1985), also now will be unavailable to compel anyone to file a registration statement once his agency has ended. If the obligation to file ends with the termination of the agency relationship, then regardless of what the statute of limitations may be, the United States will be unable to use an injunction to compel registration, since the agent is no longer under any obligation to register. The disclosure the Act seeks to compel is consequently hindered even more than it might seem at first glance. This result reinforces my conviction that the majority's holding is mistaken.[9]

### II.

The legislative history of the Act strongly, although not conclusively, supports the government's position in this case. Together with the statutory language, the legislative history makes it undeniable that McGoff remains under an obligation to register as a foreign agent, and that the government's prosecution of him is, therefore, timely.

---

**8.** The majority also rejects this view of the Act because it would "virtually eliminate" the limitations period for the failure to file, and then says that "on the one occasion Congress actually intended to eliminate a statute of limitations, it did so explicitly" as to capital crimes. Maj. op. at 1093. But to "virtually eliminate" is not to "eliminate." Section 618(e)'s "virtual" elimination is no different from that in 18 U.S.C. § 3290 (1982), for example, which the *Bailey* Court relied on without hesitation—in each instance, the statute's running is not eliminated but merely suspended until the offender rectifies his omission. And the majority's emphasis on the relative triviality (to it) of the *malum prohibitum* involved in violating a dis-

closure statute, maj. op. at 1093–94, is surely equally implicated by a statute that suspends the limitations period for anyone "fleeing from justice," 18 U.S.C. § 3290 (1982), whether felon or misdemeanant, and however trivial his offense.

**9.** The majority passes too easily over this point. The majority correctly indicates that civil enforcement mechanisms were added to offer a fly swat for cases in which that would be a more appropriate weapon than a howitzer. The majority then argues that the disarming of the fly swat is no cause for concern since the government can always use the howitzer.

Since the majority has rehearsed in detail the legislative materials pertinent to this case, and since I find the language of the statute decisive in any event, I will only highlight those parts of the legislative history I find most important.

## A.

Legislation containing the language of section 618(e), which made the failure to register a "continuing offense," was introduced on January 18, 1949. 95 Cong.Rec. 440–41 (1949). This bill did not purport to modify section 612(a). *See* 95 Cong.Rec. at 441. Thus the bill, of itself, simply relied on the then-existing section 612(a), which had no language of continuing obligation, *see supra* note 3, for the view that the agent had a continuing obligation to file after the expiration of the ten-day window; the bill made explicit only the continuing liability to prosecution of such a person. *See* 95 Cong.Rec. at 442 (letter from Attorney General Clark). By forgoing any explicit language of obligation, Congress apparently thought that the continuing character and ultimate end-point of the obligation to file would be decided by the courts, with reference to the nature of the obligation itself and to the bill's express language ultimately embodied in section 618(e). *See Bailey,* 444 U.S. at 413–14, 100 S.Ct. at 636 (finding escape a continuing offense for these reasons); *see also Toussie,* 397 U.S. at 122, 90 S.Ct. at 864 (finding nothing inherent in draft registration to render it continuing). ·

But Congress decided to state explicitly how long the obligation to file under section 612(a) continued. Consequently, separate legislation was introduced, initially in the House, to amend section 612(a). *See* 95 Cong.Rec. 5207 (1949) (introduction of H.R.

4386). The bill was approved by the Judiciary Committee of each House, with accompanying reports, each of which incorporated a letter from Assistant to the Attorney General Peyton Ford.[10] H.R.Rep. No. 1775, 81st Cong., 2d Sess. (1950); S.Rep. No. 1900, 81st Cong., 2d Sess. (1950).

The Reports, tracking the explanation in the Justice Department's letter, stated that the bill changed section 612(a) to dispel doubt on two points: First, did the limitations period for prosecution of registration violations begin when the agent first was obliged to register or on the last day on which the unregistered agent had acted? H.R.Rep. No. 1775, *supra,* at 1; S.Rep. No. 1900, *supra,* at 1. Second, what was the liability of an agent to file a registration statement for the period during which he was acting as an agent if he had since ceased this activity? *Id.*

While the first doubt might seem to be the one relevant to this case, this case is, as I said earlier, not really about the statute of limitations but rather about the extent of the obligation to register. The second doubt about section 612(a) that the bill addressed, which goes beyond the first doubt, is the one responsive to McGoff's situation: Given that McGoff is no longer an agent, what is McGoff's liability, *i.e.,* his obligation to file a registration statement for the period during which he was an agent? Both committee reports refer on this point to "several instances" in which "an unregistered agent has resisted registration on the ground that his agency had terminated prior to the time when the Department [of Justice] was demanding his registration." H.R.Rep. No. 1775, *supra,* at 2; *accord* S.Rep. No. 1900, *supra,* at 1–2, U.S.Code Cong.Serv. 1950, p. 2887. The Congressmen wanted to "remove all doubt as to the

---

**10.** Ford's letter provided in pertinent part:

In its present form, section 2 of the act provides for registration with the Attorney General of all persons acting as agents for foreign principals. However, as the section presently reads there is room for doubt as to whether the statute of limitations against prosecution of an agent for failure to comply with the registration provisions of the act commences to run from the date on which he was first required to register or from the last day on which such unregistered agent has acted. Doubt has also arisen as to the liability

of an agent to file a registration statement for the period during which he was acting as an agent of a foreign principal if he has since ceased such activity. This Department has encountered several instances of an unregistered agent's resisting registration on the ground that his agency had terminated prior to the time when the Department was demanding his registration. Clarification of the intendment of the section on these questions is considered desirable.

H.R.Rep. No. 1775, 81st Cong., 2d Sess. 3 (1950).

registrability of these [persons]," for which the Justice Department was "considering the evidence as to prosecution." H.R.Rep. No. 1775, *supra*, at 2. This discussion seems almost to have been written with McGoff in mind.

I find it most reasonable, then, to read these committee reports, and the Justice Department letter that prompted them, as answering two connected questions, or "doubts," about an agent's obligation to register under section 612(a). First, does the agent's obligation continue beyond the end of the ten-day window throughout his agency? Second, does the agent's obligation continue beyond the end of his agency? As asked, the questions are distinct, and therefore asked separately, but since the answer to each is "yes," the second answer subsumes the first.

The majority reads the second of these questions as relating to an "affirmative defense" (a term nowhere used in the committee reports) by the former agent that the end of his agency ended his obligation to file. Maj. op. at 1087, 1088, 1089. While the reports are certainly by no means clear, so that the majority's reading is not obviously mistaken, upon analysis I can see no reasonable basis to sustain this reading. I assume that the majority is referring to a prosecution against a former agent brought by the government within five years after he ended his agency. Such a prosecution could proceed in two ways. First, it could charge the agent simply with having failed to register while he was an agent. But as I have indicated earlier, it is not tenable to maintain that a later cessation of agency could relieve the agent of the duty to file he owed the government while previously an agent; an amendment to the Act was not needed to make that point clear. Moreover, references in the reports to the government's "demanding," and the former agent's "resisting," regis-

tration after he ceased to be an agent, H.R.Rep. No. 1775, *supra*, at 2; S.Rep. No. 1900, *supra*, at 1–2, show clearly that Congress was here contemplating a prosecution on an agent's obligation that continued after the end of his agency. That is the second way the prosecution of a former agent could proceed: the agent could be charged with the failure, *after* he was an agent as well as during that period, to register as required by law. That is how McGoff is being prosecuted, and that is the prosecution Congress intended by its amendments to authorize. But if the obligation to register continues after agency ends, a former agent not only has no "affirmative defense" to such a prosecution, but, since to invoke the statute of limitations itself is an "affirmative defense," *e.g.*, United States v. Wild, 551 F.2d 418, 421–22 (D.C.Cir.1977), *a fortiori* the statute has not yet even begun to run on the agent's breach of this still-continuing obligation.[9]

**B.**

There is additional legislative history that supports the government's position in this case. The McCarran–Hanson correspondence directly addressed the question of whether it was good policy "in effect [to] abolish[ ] all statutes of limitations" for the failure to register under the Act. 95 Cong.Rec. 9749 (1949) (letter from Elisha Hanson); *see id.* at 9750 (in response, rejection by Sen. McCarran of limitation on prosecuting this omission offense to "some named period of time"); 96 Cong.Rec. 12,069 (1950) (same). The Senate Report on the Internal Security Act of 1950 described the amendment to section 618(e) in that Act as meant "to provide that failure to register under the [Foreign Agents Registration A]ct shall be considered a continuing offense, thus removing it from the statute of limitations." S.Rep. No. 2369, 81st Cong., 2d Sess. 9–10 (1950). It concluded

---

9. The Senate Report says that the amendment to § 618(e) in the internal security bill, S. 595, pending simultaneously with H.R. 4386's amendment of § 612(a), "duplicate[d H.R. 4386] in part." S.Rep. No. 1900, 81st Cong., 2d Sess. 2 (1950). I believe this indicates a duplication insofar as the continuing obligation of § 612(a), together with the Act's general enforcement provision in § 618(a), would necessarily imply that

a violation of that obligation is a continuing offense absent § 618(e). Otherwise Congress could not have believed it possible to resolve a doubt about the statute of limitations for the Act's enforcement without amendment of § 618, the Act's enforcement provision. What is not duplicated by § 618(e) is § 612(a)'s express extension of the agent's obligation to file beyond his tenure as an agent.

that the amendment would "permit the prosecution of an offender at any time during the period he continues to disregard the statute and not merely within a 3–year period from" when "he first became subject to the law and should have registered but failed to do so." *Id.* at 10.

I must briefly comment on the majority's reading of this legislative history. The majority fails to take seriously the McCarran–Hanson correspondence. It dismisses it as an individual legislator's, albeit sponsor's, comment, maj. op. at 1092, which does of course lessen its persuasiveness. But the majority then says that the correspondence cannot mean what it says, for the "remarkable result" that meaning would necessitate "would be more clearly manifested [in the legislative history] than in an oblique reference." *Id.* at 1092. In other words, Congress failed to write its reports and conduct its debates on what it meant with all the attention the court thinks such a "remarkable result" required; therefore Congress did not mean what it said. This view might be justifiable when there is no statement by a Member of Congress anywhere in the legislative history that supports a given reading of an unclear statute, *see Kelly v. Robinson,* —— U.S. ——, 107 S.Ct. 353, 361–62 & n. 13, 93 L.Ed.2d 216 (1986), but that is hardly the situation here. The majority's conclusion is "especially true," it continues, because Congress later

said, in the reports on the amending of section 612(a), that the limitations period begins when agency ends. *Id.* But, as I have discussed, those reports by no means show what the majority thinks they show.

The majority simply has overlooked the Senate Report, which it neither cites nor quotes on this point. The content of Senator McCarran's individual statement, which anticipated the Report by stating that the failure-to-file offense was "remove[d] ... from the statute of limitations," *compare* 96 Cong.Rec. 12,068 (1950) with S.Rep. No. 2369, *supra,* at 10, is thus not "the statement of a single legislator that ... accomplish[es] a more drastic result" than the statute or the rest of its history supports. Maj. op. at 1092.[12]

I do not mean to suggest by my discussion of the legislative history of the Act that the history, standing alone, is conclusive one way or the other. But I think it harmonizes with the language of the statute, and contains more support for the government's position than the majority indicates.[13]

## III.

Since I find that McGoff's prosecution is authorized under the Act, I must address the question of whether the constitutional objections McGoff raises bar his prosecution. They do not.

The fact that McGoff raises constitutional arguments does not prevent a proper reading of the statute. At least some of those arguments, if not all of them, hardly qualify as "not insubstantial," *see infra* Section III, as they must be to play a role in the reading of statutes. *See Commodity Futures Trading Comm'n v. Schor,* —— U.S. ——, 106 S.Ct. 3245, 3252, 92 L.Ed.2d 675 (1986). And in any event, the presence of such constitutional questions does not permit a judicial rewrite of the statute. If the statute as written is unconstitutional, we may not save it by transforming it into something different from what Congress enacted. *See id.*

Finally, I do not think that the rule of lenity comes into play here. The rule cannot override common sense, statutory purpose, or the fair meaning—the the narrowest meaning—of statutory language. *United States v. Turkette,* 452 U.S. 576, 588 n. 10, 101 S.Ct. 2524, 2531 n. 10, 69 L.Ed.2d 246 (1981). The rule is irrelevant absent statutory ambiguity, *see, e.g., Bifulco v. United States,* 447 U.S. 381, 387, 100 S.Ct. 2247,

---

**12.** That the Report and McCarran's statement both err "as a matter of law" by suggesting that continuing offenses generally are removed from the statute of limitations, maj. op. at 1092, is hair-splitting. The point of course is that *this* continuing offense of omission is removed from the statute's operation so long as the omission continues.

**13.** I briefly dispose of the other reasons the majority gives for its reading of the Act. It finds the idea "passing strange" that an agent may be indefinitely prosecutable for an offense of relatively little gravity. Maj. op. at 1094. As I have already indicated, there is nothing "strange," illogical, or the like about this idea.

The majority is also troubled by the fact that deficient filings, not just omitted filings, might subject the agent to liability. Yet seriously deficient filings might well be important enough to justify prosecution—that is a decision for the executive branch to make. And the executive has other tools at his disposal to handle deficient filings of lesser seriousness. *See* 22 U.S.C. § 618(f), (g) (1982 & Supp. III 1985).

McGoff argues that a continuation of his obligation to file until he does file is a violation of due process. His rationale for this position, otherwise obscure, cites Justice Jackson's famous concurrence in *Krulewitch v. United States*, 336 U.S. 440, 457, 69 S.Ct. 716, 725, 93 L.Ed. 790 (1949), which questioned the constitutionality of continuing the conspiracy offense as long as its concealment, which is merely collateral to the offense, continued. In the Act before this court, of course, concealment of information by the agent is itself the offense from the beginning. I think it sufficient to state that in *Bailey* the Court was wholly untroubled by any constitutional problem with continuing the offense of flight from justice for as long as the fugitive remained at large. *See* 444 U.S. at 412–14, 100 S.Ct. at 635–37. Correspondingly, it is clear that Congress has plenary authority to establish, or abolish, statutes of limitation for federal offenses. *See United States v. Marion*, 404 U.S. 307, 322–24, 92 S.Ct. 455, 464–65, 30 L.Ed.2d 468 (1971) (distinguishing between "legislative assessments" of presumptive prejudice embodied in statutes of limitation and due process clause's protection against actual prejudice from pre-indictment delay); *United States v. Levine*, 658 F.2d 113, 126–27 (3d Cir.1981) (distinguishing statutory right to limitations period from constitutional rights); *United States v. Ganaposki*, 72 F.Supp. 982, 983–84 (M.D.Pa.1947). Nothing in the continuation of McGoff's obligation to file until he does file offends the due process clause.

McGoff also urges that hinging the end of his obligation to file in his filing results in unconstitutional self-incrimination by putting him to a choice between admitting facts in the registration statement that would reveal his past failure to register or being prosecuted if he continues not to register. This argument, although of slightly more weight than his due process claim, also lacks merit.

First, McGoff's registration would not have resulted in any incrimination whatsoever if he had registered within ten days

after becoming an agent, as the Act permits. "One able to make a timely registration with noncriminal consequences but failing to make any registration at any time is hardly in a position to challenge the constitutionality of the [Act]." *United States v. Melekh*, 193 F.Supp. 586, 592 (N.D.Ill.1961); *see United States v. Toussie*, 410 F.2d 1156, 1159 (2d Cir.1969) (distinguishing other cases as involving the claim that disclosure at any time would be incriminatory), *rev'd on other grounds*, 397 U.S. 112, 90 S.Ct. 858, 25 L.Ed.2d 156 (1970).

Second, McGoff is in the same position now that he was in, even under his reading of the Act, for the five years after he ceased to be an agent, and indeed at any time after he failed initially to register. That is to say, McGoff's self-incrimination argument would apply to any continuing offense of any duration whatever, and addresses nothing peculiar to the Act. But however characterized, the argument is patently erroneous. McGoff failed to register when he was initially required to do so. He then became liable for his failure. His liability today remains precisely the same. Consequently, McGoff's "inaction did not give rise to the threat of punishment beyond that he had already risked," and the continued obligation to register and suspension of the statute of limitations "attaches to merely continuing to exist at all, having once committed the crime." *Toussie*, 410 F.2d at 1160. The "unpleasant consequence here of [McGoff's] doing nothing" is not compulsory incrimination under the Constitution. *Id.; accord Toussie*, 397 U.S. at 134, 90 S.Ct. at 870 (White, J., dissenting); *United States v. Martin*, 733 F.2d 1309, 1311 (8th Cir.1984) (en banc).[14]

## IV.

This case presents a clear example of how a court can, with the best of intentions, step out of its proper role as interpreter of the legislature's intent and into the role of reviser of that intent. The majority makes it evident throughout its opinion that it finds the Act "Draconian" if

---

2252, 65 L.Ed.2d 205 (1980), and there is no ambiguity in this case.

**14.** McGoff claims that the Act as applied to him somehow violates the first amendment. He says that the continued threat of prosecution

understood, as it must be, to end the obligation to file only with the agent's filing. I doubt that the continuation of the obligation to register is quite so outrageous as the majority believes. If the Act were ambiguous, however, the rule of lenity might well nonetheless bestow legal relevance on the majority's finding. But although not easy to construe, the Act is not ambiguous, not even arguably, and whether it would have been Draco's choice or not, the Act is Congress' choice, to be enforced as written. Because the Act's language, structure, purpose, and legislative history all support the conclusion that prosecution of McGoff is timely, and because the majority has significantly narrowed the scope of the agent's obligation to register, which is the cornerstone of the Act,

*I respectfully dissent.*

due to his continued failure to register "chills" his activities as writer and publisher because he must "worry about being second-guessed on the motivations for his publications and writings literally for the rest of his life." Brief for Appellee at 43–44. This claim is frivolous. Any "chill" on McGoff's *present* activities due to the possibility that he might be prosecuted for his failure to disclose his *past* activities as an agent is no different from that of any person who commits a crime and who also happens to be a publisher and writer. It has no first amendment significance.